**In the Interest of P.L.O. and S.K.O., minor children.**

No. SC 85120.

Supreme Court of Missouri,

March 30, 2004.

As Modified on Denial of Rehearing April 27, 2004.

---

Sherrie L. Hansen, Anderson, Justin A. Harris, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Gary L. Gardner, Assistant Attorney General, Jefferson City, Belinda K. Elliston, Webb City, R. Scott Watson, Newton County Prosecutor, Neosho, for respondent.

Terry Neff, Neosho, Jerry Holcomb, Joplin (Guardian ad Litem), amicus curiae.

STEPHEN N. LIMBAUGH, JR., Judge.

In November 2002, the juvenile division of the circuit court, pursuant to section 211.447, RSMo,[1] terminated the parental rights of the father and mother of two minor daughters, P.L.O. and S.K.O. Only the mother, Gloria, appeals, invoking this Court's original jurisdiction under art. V, sec. 3, of the Missouri Constitution. The judgment is affirmed.

I.

P.L.O. was born in May 1990 and S.K.O. in November 1992. Gloria and her husband, Ray, also have seven other children together. The Division of Family Services (DFS) has been involved intermittently with the family since September 1986 in an effort to supplement minimal parenting skills and address other issues resulting, in large part, from poverty. In April 1997, the oldest daughter, G.O., then 14, alleged that Ray had sexually abused her for more than two years. DFS concluded there was probable cause that the allegations were true, and Gloria, at DFS' urging, asked Ray to leave the family home, which he did. DFS opened a "protective services case," but left the children in the home at

---

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

this time because of Ray's supposed absence.

Gloria, unemployed since 1973, resided in a 3–bedroom trailer with her five youngest children, then ages 6–17, and the family subsisted on welfare funds of less than $1,000.00 per month. Because Ray kept "coming around," Gloria, with her DFS caseworker's assistance, obtained an *ex parte* order against him to prevent him from contacting the children. Nevertheless, after expiration of the *ex parte* order, and with Gloria's knowledge, Ray continued to visit.

The children suffered from chronic head lice and a filthy environment. DFS arranged for Gloria to undergo an intensive home services program to address these and other substandard care issues. Gloria received counseling for six months and participated in a "Futures Program" to help her with job-training, obtaining employment, and becoming independent because her eligibility for welfare payments was ending. DFS also repeatedly provided Gloria with products and services to care for the head lice infestation, but to no avail. In addition, DFS helped Gloria obtain a new trailer, but Gloria soon allowed it to become filthy as well.

Gloria claimed to be home schooling P.L.O. and S.K.O. even though she had been advised that P.L.O. needed special education services. The other school-age children missed school continually due to lice infestation. Unfortunately, the home environment continued to deteriorate, Gloria offered a variety of excuses for her refusal to obtain and maintain employment, and Ray continued to visit the children.

In view of this situation, on September 2, 1999, the juvenile officer removed the five children from the home and placed them in DFS custody. The next day, September 3, the juvenile officer filed a petition under section 211.031.1(1), alleging that Gloria neglected to provide the care and support necessary for the children's well-being. In particular, the petition alleged that the children suffered from chronic head lice resulting in numerous missed school days; that their home was below minimum standards of cleanliness with soiled clothes strewn on the floors, stacks of dirty dishes, food on the carpet, and general filth throughout the home; and that the mother did not follow through with necessary medical treatment for the children. The juvenile court then entered an "Order of Protective Custody" over the four youngest children, but terminated jurisdiction over the oldest daughter, G.O., who was then 17. On September 10, 1999, Gloria voluntarily signed a "Temporary Transfer of Custody" in lieu of an adjudication of abuse or neglect. In that document, she waived service of summons, entered her appearance, and stated, "I ... do hereby give my consent for my children to be placed in the temporary care and custody of the Court and the Division of Family Services."

Upon entering DFS custody and foster family placement, both P.L.O. and S.K.O. were well behind their peers educationally, intellectually, and socially. P.L.O., 9, tested at the cognitive level of a 4–year old, unable to recite the alphabet or recognize basic colors. S.K.O. was placed in a grade level below her chronological age. While living with their mother, neither girl received childhood immunizations on schedule. In addition, P.L.O. has no vision in one eye due to an untreated eye injury, which occurred when Ray threw a "car part" at her and a metal shard entered her eye. Both girls later alleged that their father had sexually abused them, too.

A year later, in September of 2000, Gloria and DFS entered into a written "service agreement" outlining requirements for

the return of her children. Among other things, that agreement provided for a continuation of the supervised visitation with the girls that had been implemented since their removal. Although DFS worked with Gloria in an attempt to reunite the family, she did not regularly meet with her caseworker, nor did she maintain employment, and, on the whole, she made very little progress to improve her situation. At one point, Gloria initiated a dissolution from Ray, but chose not to finalize it for religious reasons.

The girls became physically ill and distraught on days they were to have their supervised visits with Gloria. Because of the girls' distress, their treating psychologist began to supervise Gloria's visitation. Gloria did not attend the visits regularly, and when she did, she was usually late. There also is evidence that on occasion, she attempted to see the girls unsupervised at inappropriate times and places, such as at their school and church. In the meantime, the DFS caseworker tried to meet monthly with Gloria to review a reunification plan, but Gloria did not comply. The psychologist saw no improvement in Gloria's dependent behaviors, nor in her efforts to obtain steady employment or to find reliable transportation, and ultimately determined that visitation was not productive for the girls. Through all of this, Gloria consistently placed the blame for her situation on DFS.

Gloria last visited with the girls in February 2001, and the girls entered a new foster/pre-adoptive home soon thereafter. In March 2001, after several attempts to contact Gloria, Gloria finally met with a new caseworker and entered into the first of four new service agreements, still with the goal of family reunification. However, Gloria again failed to comply with the agreements. In June 2001, DFS ended funding of Gloria's counseling due to the length of time and lack of progress, and though DFS arranged for free individual counseling to continue with another program, Gloria attended only once.

On January 31, 2002, DFS filed a petition for termination of parental rights to the two youngest children, P.L.O. and S.K.O., the older siblings having attained majority. In May 2002, pending trial, DFS learned that the electricity in Gloria's trailer had been shut off. Though the caseworker attempted to contact Gloria by letter to help restore the electric service, Gloria never responded. She later admitted to the court that her trailer still had no heat or electricity. After numerous delays, a trial was held in September and October 2002. In addition to the facts already recounted, it was shown that Gloria contributed only once to the girls' care and maintenance despite a court order entered in 2001 requiring monthly child support payments from her, and this contribution was made only after DFS filed the petition for termination.

In a judgment entered October 31, 2002, the court found "by clear, cogent and convincing evidence" the existence of the several alleged grounds for termination of parental rights. The court also entered specific fact-findings including, *inter alia,* that Gloria allowed the father to visit the children despite allegations of sexual abuse; that Gloria failed to obtain medical care for P.L.O. and S.K.O. when required; that the girls were "horrifically deprived educationally;" and that the two "[girls] have been caused to suffer greatly due to the actions and inactions of their parents." Additionally, the court found that neither parent showed commitment to nor interest in the children. The court then concluded that termination of parental rights was in the best interest of the minor children. Judgment terminating parental rights was entered accordingly.

## II.

■ Gloria first argues that using section 211.447.2(1) as a ground for termination is unconstitutional because it arbitrarily and capriciously "[deprives her] of her liberty interest in the care, custody and management of her children without due process of law." That section states in pertinent part:

[A] petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division, ... when:

(1) Information available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months....

As this Court recently held in *In the Interest of M.D.R.*, 124 S.W.3d 469, 476 (Mo. banc 2004), no constitutional issue exists because this section is not a ground, but merely a trigger for the filing of the termination petition.

## III.

■ Gloria's next point consists of a long list of alleged violations of the mandatory procedures and timelines set out in chapters 210 and 211 for the removal of children from their home and their continued placement in foster care. Those violations, Gloria contends, constitute an infringement on her substantive and procedural due process rights.[2] However, this Court need not address the merits of the particular violations alleged because Gloria affirmatively consented to the removal of her children and to the jurisdiction of the juvenile court over them. She makes no challenge to the voluntariness of her consent. In fact, for the two years after the children were removed, until DFS began termination proceedings, she

2. The specific violations alleged are that the court:

1) allowed the juvenile officer to remove the children from the home without making reasonable efforts to prevent removal, without the existence of emergency conditions, and without a court order, in violation of the Adoption and Safe Families Act, RSMo 211.183.1, RSMo 211.183.5, and the 4th Amendment of the United States Constitution;

2) failed to make findings as required by RSMo 211.183.3 and RSMo 211.183.5 in its Order of Protective Custody;

3) failed to give the appellant written notice of her right to a protective custody hearing as required by Supreme Court Rule 111.13(c) and RSMo 211.032.1;

4) failed to hold a dispositional review hearing within 12 months from the time the children were placed in foster care as required by Supreme Court Rule 119.08(a);

5) failed to hold a permanency hearing within 12 months of the time the children were placed in foster care as required by RSMo 210.720;

6) failed to make efforts to place the children in a foster home of the same religious faith as that of the birth family as required by RSMo 211.221;

7) failed to review the status of the children every six months as required by RSMo 210.730;

and that the Division of Family Services:

1) failed to file a written status report on the children every 6 months following foster care placement as required by RSMo 210.720.1;

2) failed to develop a case plan for the children within thirty days as required by 13 CSR 40–30.010(2);

3) failed to develop a written service plan within 72 hours of placement and failed to evaluate the progress of the appellant and children every three months as required by 13 CSR 40–73.075;

4) ceased reasonable efforts to reunite the children with the Appellant without trial court knowledge or approval as required by RSMo 211.183.6, RSMo 211.183.7, and RSMo 211.183.8 and the Adoption and Safe Families Act;

5) ceased all contact between the Appellant and her children, including visitation, written, and oral contact, without trial court knowledge or approval and in violation of 13 CSR 40–73.075;

made no objection to her children remaining in foster care, much less to move the court for their return.

■ Furthermore, most of the alleged violations pertain to the statutory and regulatory requirements and timelines for service plans, child status reports, and dispositional or review hearings. Although these statutes and regulations are stated in mandatory terms, failure to comply does not deprive the court of jurisdiction. *See In re D.K.S.*, 106 S.W.3d 616, 618–19 (Mo. App.2003) (dispositional hearing held 34 months after child removed from parent's custody); *In re L.E.E.*, 839 S.W.2d 348, 352 (Mo.App.1992) (17–month period without permanency hearing before petition for termination filed); *D.D.C. v. B.C.*, 817 S.W.2d 940, 944 (Mo.App.1991) (no dispositional hearing *at all* before subsequent termination). Moreover, there is no statutory consequence for failure to comply, and the timelines are "little more than a time after which an action for mandamus will lie." *D.K.S.*, 106 S.W.3d at 618. Although this Court in no way condones the failure to comply with the various statutes and regulations, some of which is admitted, the fact remains that Gloria took no action at all, either by mandamus or by motion to the court, to secure compliance. In short, given her consent to removal and foster care placement, and her unwillingness or disinterest in availing herself of the protections afforded to her, she cannot now raise the alleged due process violations as defenses to the termination of her parental rights.

### IV.

■ Gloria next argues that section 211.183.1—the child removal statute—is void for vagueness, because the term "emergency" is not defined, providing no notice as to what conduct would place her children in jeopardy of removal. The ab-

sence of a definition, she explains, allows for arbitrary and discriminatory enforcement. Just as with the preceding point, however, there is no need to address the merits of the issue because Gloria voluntarily consented to jurisdiction of the court and voluntarily transferred custody of her children to DFS. She did not contest the circumstances of the removal, that is, whether an "emergency," as that term is used under the statute, did or did not exist.

### V.

Gloria's final claim is that DFS failed to prove by clear, cogent and convincing evidence the pleaded statutory grounds for termination: 1) that she abandoned her children, sec. 211.447.4(1)(b); 2) that she abused or neglected her children, sec. 211.447.4(2); and 3) that her children had been under the jurisdiction of the juvenile court for one year, and the conditions which led to assumption of jurisdiction still persisted, or conditions of a potentially harmful nature continued to exist, sec. 211.447.4(3). She also claims that the evidence did not support the finding that termination was in the best interests of the children.

■ The standard of review for judgments terminating parental rights is based on the requirements of section 211.447.5 that 1) the trial court must find by clear, cogent, and convincing evidence that one or more grounds for termination exists under subsections 2, 3 or 4 of section 211.447 and 2) the trial court must find that termination is in the best interests of the children. *In re K.C.M.*, 85 S.W.3d 682, 689 (Mo.App.2002); *In re M.O.*, 70 S.W.3d 579, 584 (Mo.App.2002). Whether statutory grounds under section 211.447.2, .3 or .4 have been proven by clear, cogent and convincing evidence is reviewed under the standard set forth in *Murphy v. Carron,*

536 S.W.2d 30, 32 (Mo. banc 1976); in other words, the trial court's judgment will be affirmed unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. *See In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984); *K.C.M.*, 85 S.W.3d at 689. Proof under this standard of only one of the statutory grounds alleged is sufficient to sustain the judgment. *See In re E.L.B.*, 103 S.W.3d 774, 776 (Mo. banc 2003). Then after determining that one or more statutory grounds have been so proven, the court must consider the question of whether termination also is in the best interests of the child. On that question, the standard of proof at trial is a preponderance of the evidence, and the standard of review on appeal is abuse of discretion. *K.C.M.*, 85 S.W.3d at 690; *M.O.*, 70 S.W.3d at 585. In all of these determinations, the reviewing court is deferential to the fact-findings of the trial court and considers all the evidence and reasonable inferences from the evidence in the light most favorable to the judgment. *In re N.R.W.*, 112 S.W.3d 465, 468 (Mo.App.2003); *K.C.M.*, 85 S.W.3d at 689.

## A.

■ First, the evidence was sufficient to establish that Gloria abandoned P.L.O. and S.K.O. Under section 211.447.4(1)(a), a child is abandoned if, for a period of six months or longer, the parent, without good cause, does not provide "parental support" and does not make "arrangements to visit or communicate with the child, although able to do so." Intent of the parent to abandon may be inferred from evidence of his or her conduct. *See W.B.L.*, 681 S.W.2d at 455. Little or no weight need be given to "infrequent visitations, communications, or contributions." Sec. 211.447.7.

Here, the evidence showed that Gloria, without good cause, failed to schedule visits with her children, although DFS repeatedly contacted her for that purpose. Though from time to time, Gloria did send letters and other messages to DFS regarding visits with her children, she rarely specified dates of her availability or complied with DFS requests to meet with the caseworker in person. Supervised visits originally were set up for one hour weekly in September 1999, but as the weeks passed, Gloria most often arrived for the visits late or missed them altogether. On occasion, Gloria attempted to see the girls unsupervised at inappropriate times and places, such as their school and church. The last scheduled visitation was in March 2001. By that time, the girls' psychologist recommended that visitation cease due to the girls' physical and psychological distress at being forced to see their biological mother. However, DFS did not foreclose visitation. Gloria did subsequently request visitation, and in response, DFS contacted her repeatedly to meet with the caseworker, but in the nine months until January 2002, when her counsel intervened, Gloria "failed to make the effort to schedule an opportunity to discuss visitation."

The evidence also showed that Gloria did not provide parental support for her children. She was employed for periods of time after the children were removed, once for eleven months, and the court ordered her to pay $109 monthly for her four children in DFS custody. However, she only made one payment in the fourteen months that support was mandated, and that payment was not made until DFS filed the petition for termination. Though she counters that DFS should not have expected her to find steady employment after she had been unemployed for the twenty-six years preceding the removal of her children, DFS provided her with counseling

for six months and enrolled her in a "Futures Program" to help her with job-training and financial independence. In addition, she held a high school degree, she had experience as a nurse's aide, and was otherwise employable. Nonetheless, she offered a variety of unsatisfactory excuses to end her employment and refused to obtain other employment and, for these reasons, cannot now use unemployment as good cause for her alleged inability to pay. Additionally, even while employed, Gloria did not contribute to the children's well-being in other ways, such as by providing clothing, school supplies, lunch money, and the like.

## B.

■■■ The evidence is also sufficient to establish that Gloria abused or neglected her children. Section 211.447.4(2) sets out four factors of abuse and neglect, but only factors (c) and (d) are at issue. Factor (c) applies where there are "recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family ... under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family." Factor (d) applies where there is "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development."

The evidence of most concern is Gloria's inability to protect the girls from Ray and to obtain suitable treatment when they have been injured. Gloria acknowledged the sexual abuse, at least to the extent that she saw Ray touch her oldest daughter in an "unfatherly" way. Though she "discussed the matter with [Ray]," she did not

remove him from the home until DFS insisted she do so and, then, allowed him access to the children despite entry of an *ex parte* order. In addition, after Ray threw a car part that hit P.L.O. in the eye, the injury was aggravated by the fact that Gloria did not seek immediate medical care, and eventually P.L.O. lost all vision in that eye. Moreover, even though she later scheduled appointments with eye specialists, she failed to keep the appointments.

Gloria also failed to provide adequate shelter, personal cleanliness, and even basic education for P.L.O. and S.K.O. despite DFS arrangements for Gloria to participate in several programs to address these issues. She did not enroll the girls in school, or home-school them as she claimed she was doing, despite being advised that P.L.O. required special education services. Gloria's home—both the old trailer and the new—was always filthy and continuously infested by lice. The caseworkers' many attempts to rectify the situation were unsuccessful. Gloria eventually avoided the caseworker's attempts to make home visits, and no visit whatsoever took place from September 2001 until a pre-arranged visit in February 2002. Though by the time of trial the conditions of the trailer had improved, Gloria admitted she did not have electricity or heat. As a result, the home had once again become unlivable.

## C.

■■■ The children have been under the jurisdiction of the juvenile court for more than one year, and substantial evidence exists that the conditions that led to assumption of jurisdiction still persist or conditions of a potentially harmful nature continue to exist. On this point, and in addition to Gloria's inability to provide a safe and appropriate home due to lack of

electricity and heat, the court found that she had limited insight into problems, that she was inflexible in her thinking, and that she did not take responsibility for her own actions. Gloria argues that the lack of electricity in her home was due to poverty, but her poverty could be at least partially redressed if she obtained and maintained employment. Furthermore, as noted, DFS attempts to help Gloria regain electricity were unsuccessful because she did not respond to the caseworker's letter. Unfortunately, this conduct is consistent with her repeated failures to comply with DFS service agreements and, as the record reflects, the fact that she spent her time in counseling blaming her situation on DFS rather than addressing her own responsibility. It bears mention again that she voluntarily left her children in DFS custody for two years and did not even attempt to accept financial responsibility for them until the petition for termination. Finally, she continues to allow Ray access to her home, which demonstrates that conditions of harm to the children continue to exist.

### D.

■■■ The evidence also supports the trial court's finding that the termination is in the best interests of the children. Under section 211.447.6(1)–(7), the trial court must make findings on seven "best interest" factors when considering whether to terminate the parent-child relationship. The specific factors, in order, and the court's responses are:

1) the children's "emotional ties to the birth parent," and the court's finding that the girls' emotional ties to Gloria are "not seen as ... positive ties;"

2) the "extent to which the parent has maintained regular visitation or other contact with the child," and the court's finding that Gloria has not done so;

3) the "extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division ...," and the court's finding that Gloria "failed to pay for any of the costs ... when financially able to do so;"

4) "whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time," and the court's finding that additional services would be unlikely to achieve that result;

5) the "parent's disinterest in or lack of commitment to the child," and the court's finding that Gloria demonstrated disinterest in and lack of commitment to the girls through her "actions and lack of actions;"

6) a parent's felony conviction—not applicable; and

7) whether there were "deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm," and the court's finding that Gloria "has committed deliberate acts," as discussed above, "which have subjected the children to substantial risk of physical or mental harm."

To restate the evidence as it bears on these findings is unnecessarily repetitive. Suffice it to say that the record amply supports these findings, and for that reason, the trial court did not abuse its discretion in finding that termination was in the best interests of the minor children.

## VI.

For the foregoing reasons, the judgment is affirmed, and the case is remanded for assessment of attorneys' fees and costs under section 211.462.4.

All concur.