211 S.W.3d 93 (2007)
In the Interest of C.W.
No. SC 88049.
Supreme Court of Missouri, En Banc.
January 9, 2007.
*96 Geoffrey L. Pratte, Framington, for Appellant.
Rebecca Shelton, Farmington, for Respondent.
Anthony E. Rothert, St. Louis, for amicus curiae American Civil Liberties Union.
Jennifer Mathis, Washington, D.C., for amicus curiae Bazelon Center for Mental Health Law.
Jack L. Duncan, Park Hills, Guardian ad Litem.
RICHARD B. TEITELMAN, Judge.
A.W. (Mother) appeals from a judgment terminating her parental rights to her son, C.W. Mother claims that the circuit court erred in accepting and relying on an investigative study submitted prior to the petition to terminate parental rights and that the evidence is insufficient to support the judgment. Both of these claims have merit. Consequently, the judgment is reversed, and the case is remanded.

I. Background

Mother gave birth to C.W. on June 19, 2003. C.W. was born with a cleft palate and micrognathia, which are conditions that necessitate special care and feeding. When C.W. was five days old, he was taken from Mother's custody and placed with the Missouri children's division. The state removed C.W. from Mother's custody based upon concerns that Mother could not adequately care for C.W. given his special needs and Mother's bipolar disorder and mild cerebral palsy.
Mother entered into a written service agreement with the children's division in which she was required to comply with thirteen directives, including completion of a psychological examination. The psychologist evaluated Mother. In her August 25, 2003, report, she concluded Mother was, at that time, "not mature enough to care for her baby" and recommended adoption. However, the psychologist concluded that if Mother continued to work through her issues, she may in the future be able to "be a good and responsible mother."
In July 2005, the children's division and the juvenile office sought leave to file petitions for termination of Mother's parental rights. On July 25, 2005, the circuit court entered an order that stated "Children's Division granted leave to file TPR."
On October 17, 2005, the children's division filed a "Termination of Parental Rights Investigation and Social Study  211.455.3." On October 21, 2005, the juvenile office filed its petition for termination of parental rights. Mother filed her answer and also objected to the investigation and social study on the grounds that section 211.455, RSMo 2004,[1] requires the *97 study to be ordered by the court after the petition is filed, not before. On February 3, 2006, the court entered judgment terminating parental rights and specifically stated that it took judicial notice of the study. Mother appeals.

II. Section 211.455

Section 211.455 provides, in part, that "[w]ithin thirty days after filing the petition, the juvenile officer shall meet with the court in order to determine that all parties have been served with the summons and to request that the court order the investigation and social study." Mother maintains that the circuit court violated section 211.455 by accepting the investigation and social study from the children's division prior to the filing of the petition. The juvenile office asserts that section 211.455 does not require the study to be filed after the petition and that even if there was not strict compliance with the statute, Mother was not prejudiced and there is no reversible error. That assertion is not consistent with section 211.455.
The plain language of section 211.455 provides that within thirty days after the petition is filed, the juvenile officer shall meet with the court to request that the court order the investigation and social study. Although the statute is phrased in part as a directive to the juvenile officer, use of the term "shall" also imposes an obligation upon the circuit court to meet with the juvenile officer after the petition is filed. At this meeting, the juvenile officer is to request that the court order the investigation and social study. Because the written investigation and social study referenced in section 211.455 is mandatory, In the Interest of T.G., 965 S.W.2d 326, 332 (Mo.App.1998), the net effect is that the circuit court must order the study at some point after meeting with the juvenile officer.
The court of appeals reached the same conclusion in In the Interest of A.H., 169 S.W.3d 152, 158 (Mo.App.2005). In A.H, the children's division filed the investigation and social study simultaneously with the petition. Id. at 154. The court held that the word "shall" made the statute mandatory rather than directory. Id. at 158. The court also noted that the original versions of the juvenile code did not require the court to meet with the juvenile officer to determine who would conduct the study. Id. at 157. However, when the code was amended in 1985, the juvenile officer and the court were required to meet regarding the study. Id. The A.H. court considered the statutory amendments in context with the requirement of strict compliance with the juvenile code and concluded that section 211.455 is mandatory and that the court must determine which agency will write the investigation and social study. Id. By requiring the investigation and social study to be filed after filing the termination petition, the statute grants the circuit court the opportunity to determine which of several authorized agencies will conduct the study.[2] This procedural requirement indicates that the legislature did not intend to vest the children's division with the sole authority to determine which agency would prepare the study. Id. at 158. The reasoning in A.H. is consistent with the language of the statute. Therefore, this Court holds that section 211.455 requires the circuit court to order the mandatory investigation and social study after the petition is *98 filed.[3]
The juvenile office relies on In the Interest of A.D.G., 23 S.W.3d 717 (Mo.App. 2000), to argue that even if there was not strict compliance with the statute, there is no reversible error because Mother was not prejudiced. In A.D.G., the father argued that the court erred by not holding a meeting with the juvenile officer as required by section 211.455. The court rejected this argument, finding the record inconclusive and noting that the father "failed to show how he was prejudiced" if the meeting did not occur. Id. at 719.
The A.D.G. case does not establish that a parent facing the termination of parental rights bears the burden of establishing prejudice if the mandatory requirements of section 211.455 are violated. The holding in A.D.G. is premised upon the fact that the record was inconclusive as to whether the meeting occurred. The subsequent statement regarding the lack of prejudice cited no supporting case law and was conditioned upon a hypothetical situation in which the record was unclear as to whether there was a meeting. This statement is non-binding dicta which this Court declines to follow.
In this case, the circuit court did not meet with the juvenile officer to make a decision regarding which agency would prepare the investigation and social study. As a result, the children's civision, an interested party that was seeking the termination of Mother's parental rights, essentially selected itself to submit the study. The circuit court did not strictly comply with the mandatory requirement in section 211.455 that the investigation and social study be submitted after the petition is filed. Given the fundamental interests involved, there must be strict and literal compliance with the statutes authorizing the State to terminate the parent-child relationship. In re K.A.W., 133 S.W.3d 1, 16 (Mo. banc 2004). Failure to strictly comply with section 211.455 is reversible error.

III. Termination of parental rights

Section 211.447 provides various grounds for a termination of parental rights. A trial court must find the existence of at least one ground and that the termination of parental rights is in the child's best interests. In re A.S.W., 137 S.W.3d 448, 452 (Mo. banc 2004). The state bears the burden of proof, which must be met by the presentation of substantial evidence, which is evidence that, if true, is probative of the issues in the case. Id.
A judgment terminating parental rights must be based upon more than past conditions. "Regardless of the past, [termination of parental rights] `requires the trial court to determine that the parent is currently unfit . . . to be a party to the parent-child relationship.'" In re K.A.W., 133 S.W.3d 1, 20-21 (Mo. banc 2004), quoting In re T.A.S., 32 S.W.3d 804, 815 (Mo. App.2000). While past behavior is one component of finding grounds for termination, the circuit court must also assess the extent to which past behavior is predictive of similar issues in the future. K.A.W., 133 S.W.3d at 10. Findings supporting earlier determinations are not irrelevant, but such findings must be updated to address the parent's current ability and willingness to parent as well as the potential for future harm. Id. There *99 must be a prospective analysis with some explicit consideration of whether past behaviors indicate future harm. Id.
The circuit court found three separate grounds warranting the termination of Mother's parental rights and also determined that termination would be in the best interest of C.W. These findings must be supported by "clear, cogent and convincing evidence." Sec. 211.447.5. Clear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. A.S.W., 137 S.W.3d at 453. This Court defers to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. In the Interest of M.E.W, 729 S.W.2d 194, 195-6 (Mo. banc 1987).
1. Abuse and neglect
The first ground for termination was that Mother had abused and neglected C.W. In pertinent part, the court found that:
10. [C.W.] has been abused and neglected pursuant to 211.447.4(2). The child was taken into custody . . . because C.W. was born with a cleft palate and micrognathia, which requires careful feeding and follow-ups; [Mother] did not follow through with feedings and constant care that was needed; and she has a significant clinical psychiatric diagnosis which impairs the mother's ability to take care of [C.W.] with the careful feedings that he needs and follow-ups with constant medical attention.
(a)[Mother] suffers from a mental condition which is either permanent or of such a nature that the condition can not be reversed and which renders the parent unable to knowingly provide the children with the necessary care, custody, and control. [Mother] has been dealing with mental health issues since she was a teenager. [Mother] has been diagnosed by Dr. Walker with bi-polar disorder, dysthymic disorder, and personality disorder. Dr. Walker's professional opinion was that [Mother] would be unable to take care of [C.W.]. [Mother] made several suicidal attempts when she was a teenager and her last attempt was in 2002. In 2004, [Mother] was failing to take her Haldol shot. [Mother] also has cerebral palsy. [Mother] continues to work with BJC in regards to her mental health issues. [Mother] admitted on the stand that at this time she would not be able to take care of [C.W.] at this time without some support."
The court specifically found that Mother had not committed any specific, deliberate acts of abuse and that she had provided C.W. with adequate food, clothing, and shelter. Thus, the abuse and neglect finding was predicated upon the findings quoted above in which the court concluded that Mother's mental health issues are permanent or irreversible and would prevent her from caring adequately for C.W. If this conclusion was supported by the court's findings of fact and the evidence, then there may be grounds to affirm the judgment. However, that is not the case. The court supported its findings by relying almost exclusively upon Dr. Walker's evaluation of Mother's mental health status in 2003. Dr. Walker admitted at trial that she had not interviewed Mother for twenty-nine months and that she did not know Mother's current mental health status. Dr. Walker also testified that her evaluation of Mother was based upon generalized conclusions regarding the effects of bipolar disorder and not any specific instance *100 of neglect by Mother. In the years between Dr. Walker's evaluation and trial, Mother had received treatment and medication for her bipolar disorder, C.W. underwent surgical treatment for his cleft palate, and C.W. had matured from an infant to a toddler, thus minimizing the need for specialized feeding. The court specifically found that since May 2004, Mother has been in compliance with the requirement that she undergo mental health counseling. Given the changed circumstances and because Mother's mental health status was the underlying reason for terminating her parental rights, it is crucial that the evidence clearly establish Mother's current mental health status and how that status impacts her present and future ability to adequately parent C.W. Without such evidence, Mother's fundamental liberty interest in preserving the parent-child relationship is terminated on the basis of speculation instead of verifiable facts. The court's findings are inadequate to support a determination of abuse and neglect under section 211.447.4(2).
2. Failure to rectify
In the second ground for termination, the court found, pursuant to section 211.447.4(3), that Mother failed to rectify the conditions that caused the court to assume jurisdiction:
11. C.W. has been under the jurisdiction of the court for a period of over two years. This court took jurisdiction based on the conditions in paragraph 10. The conditions which led to the assumption of jurisdiction still persist and the conditions of a potentially harmful nature continue to exist. [Mother] has had mental health issues since she was a teenager and tried several times to commit suicide. [Mother] was in foster care as a teenager because her mental health issues were out of control. In 2004, [Mother] went several months without taking her monthly Haldol shot. [Mother] continues to deal with her mental health disorder and her cerebral palsy. [Mother] admitted she has not held or picked up C.W., a two year old, for over one year, even though she visits with him weekly. C.W. is an infant, who has major medical problems that will follow him through life, he may need numerous surgeries and there is a strong possibility he may have mental health issues. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to any of the named parents in the near future. The Children's Division has been working with [Mother] for over two and a half years and she admits that even at this time she would be unable to take care of C.W. without support. Furthermore, continuation of the a parent-child relationship greatly diminishes the child's prospects of early integration into a stable and permanent home environment. After working with the family for over two years [C.W.] still throws fits at his visits and is very confused about who "mom" is.
As with a finding of abuse and neglect, courts have also required that a failure to rectify sufficient to support termination under section 211.447.4(3) must be based upon a determination that conditions of a potentially harmful nature continued to exist as of the termination. K.A.W., 133 S.W.3d at 10. The circuit court supported its finding that Mother failed to rectify the conditions leading to the assumption of jurisdiction by referencing its earlier findings regarding Mother's mental health status and concluding that Mother's mental health issues still persist. However, as discussed above, there was no updated expert testimony reflecting Mother's current mental health status or the present needs of C.W. Nor was there any current, updated expert testimony reflecting a prognosis *101 for Mother's future recovery. The insufficient findings with respect to abuse and neglect cannot be bootstrapped into a valid finding of failure to rectify. Without evidence of Mother's current mental health status and of her prognosis for continued recovery, there is not clear, cogent, and convincing evidence that Mother has failed to rectify the conditions leading to the assumption of jurisdiction.
3. Unfit to be a parent
The final ground for termination was that Mother was unfit. The court found that:
12. [Mother] is unfit to be a party to the parent child relationship pursuant to section 211.447.4(6) because of her inability to take care of her son as stated by Ms. Lauretta Walker and as also admitted by [Mother] that she would still need support after two years of working with the Children's Division. [Mother] has visited with her child; however, [Mother] has yet to form a bond with her son. After two years [C.W.] will not stay in the room with just [Mother]. She has not actively interacted with him until recent months and continues to have relations with someone she has admitted she knew had a substantiated sex abuse report. These conditions directly relate to the parent and child relationship and are of a duration and nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.
The court found Mother unfit to be a parent based upon Dr. Walker's evaluation, because Mother admitted she would need help to care for C.W., because she did not bond with C.W., and because there was a "substantiated" sexual abuse report against Mother's boyfriend. Again, Dr. Walker's 2003 evaluation is not current and does not establish that Mother is unfit. Mother's admission that she would require help to parent C.W. is also not a sufficient basis for termination. In re A.S.W., 137 S.W.3d 448, 454 (Mo. banc 2004). Furthermore, Mother's father and stepmother testified during trial that they would both be willing and able to provide support to mother if she regained custody of C.W.
The finding that Mother and C.W. were not bonded, while relevant, is not surprising given that C.W. was removed from Mother's custody days after birth and that Mother was required to visit C.W. in a small room at children's division's offices. The court also found that the lack of bonding was evidenced by the fact that Mother did not hug or hold C.W. This finding is unsupported by the record, which indicates only that Mother did not pick C.W. up, not that she did not hold him or hug him. Notably, the court did find that Mother attended all of her scheduled visits with C.W. If anything, Mother's attendance at the scheduled visits indicates that she was in fact bonded with C.W. Under these circumstances, where C.W. was taken from custody five days after birth, it is almost a foregone conclusion that the bond between parent and child will not be as strong as it otherwise would. Courts should take into account this reality when passing judgment upon the bond between parent and child.
In finding Mother unfit, the court also noted the "substantiated" sex abuse allegations against Mother's boyfriend. There was no substantiated sex abuse allegation. Sex abuse allegations were made against the man during a contested custody case, but all charges were dropped. The only thing that was "substantiated" was that a report was made, not that there had been *102 any abuse. The evidence does not support a finding that Mother's relationship rendered her unfit to parent C.W.
4. Best Interests
After determining that grounds for termination existed, the court found that termination would be in the best interests of C.W. The court found that:
(1) C.W. does not have significant emotional ties to [Mother]. . . .
(2) [Mother] has been present at all visits with her child except for illness and bad weather. . . . [Mother] has become more active with C.W. since the filing of the petition and the passing of her mother. . . .
(3) . . . [t]there is no child support order in regards to this case due to both parents receiving social security benefits. [Mother] has provided several outfits for C.W. since he's come into care. She has given C.W. birthday and Christmas gifts, although, she did not let him keep them as she wanted to them at home when he came there.
(4) Additional services being provided by Juvenile Office or the Children's Division would be unlikely to bring about a lasting parental adjustment enabling return of the biological or legal parents within an ascertainable period of time. See paragraphs 10, 11, and 12. All findings are hereby incorporated by reference.
(5) [Mother] is interested in C.W., however, she is unable to overcome her mental abilities and comply with services that will help her adequately take care of C.W.. . . .
(6) Neither parent has been convicted of a felony.
(7) Neither [Mother] nor [Father] have committed deliberate acts of abuse upon the children which subjected children to a substantial risk of physical or mental harm.
As discussed above, if Mother and C.W. are not strongly bonded, it is not readily apparent that such lack of bonding is Mother's fault. The evidence was, as the circuit court found, that she attended all of her scheduled visits and that she has become increasingly involved with C.W.
The finding that additional services would be unlikely to adequately assist Mother in parenting C.W. and that Mother will not be able to overcome her mental health issues suffer from the same fatal flaw that underlies the rest of the judgment; that there was no current, expert testimony establishing Mother's capacity to adequately parent C.W. Without current evidence of Mother's mental health status, the court has no substantial basis to assess what services may be helpful and if those services would assist Mother in parenting C.W. The court's finding that termination is in the best interest of C.W. is not supported by clear, cogent, and convincing evidence.

IV. Conclusion

The circuit court erred in not ordering the investigation and social study after the filing of the petition as required by section 211.455. The court further erred in finding that the juvenile office satisfied its burden of establishing a ground for termination and that termination was in the best interest of C.W. The judgment is reversed, and the cause is remanded.
All concur.
NOTES
[1] All statutory references are to RSMo 2004 unless otherwise indicated.
[2] 211.455.3 provides that the study must be prepared by the juvenile officer, the state division of family services, a public or private agency authorized or licensed to care for children, or any other competent person as directed by the circuit court.
[3] The juvenile office also argues that this Court should infer that the circuit court ordered the investigation and social study in its July 25, 2005, order granting leave to file the petition. Even if this Court were to draw that inference, it would not aid the juvenile office's position because section 211.455 requires the study to be filed after the petition.