**In the Interest of R.S.L. and P.X.L., Plaintiffs.**

**Juvenile Officer, Respondent,**

v.

**D.C. (Natural Mother), Appellant.**

**No. WD 67849.**

Missouri Court of Appeals, Western District.

Oct. 2, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 20, 2007.

Application for Transfer Denied Jan. 22, 2008.

Noel T. Magee, Columbia, MO, for plaintiffs.

Melissa A. Fourot, Columbia, MO, for appellant.

Ellen K. Haynes, Columbia, MO, for respondent.

Before HOWARD, C.J., BRECKENRIDGE [1] and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Special Judge.

D.C. appeals the judgments of the trial court terminating her parental rights to her children, R.S.L. and P.X.L. She claims that the trial court violated section 211.455, RSMo 2000,[2] by admitting into evidence and relying on the investigation and social study filed by the Children's Division with the petitions for termination of parental rights. She also asserts that clear, cogent, and convincing evidence did not support the termination of her parental rights based on abuse and neglect under sections 211.447.4(2)(a), (b), and (d), failure to rectify under section 211.447.4(3), or parental unfitness under section 211.447.4(6). Finally, she claims that the evidence did not support the finding that termination of her parental rights was in the best interests of the children. The judgments are affirmed.

## Factual and Procedural Background

D.C. (Mother) is the mother of P.X.L., a male child born May 7, 1995, and R.S.L., a male child born February 14, 1998. The children's father (Father) is deceased.

The children were first taken into protective custody in May 2000 after Mother tested positive for cocaine on the day she gave birth to another male child, W.L. The baby tested positive for cocaine and marijuana. In August 2000, the children were found to be within the jurisdiction of the court pursuant to section 211.031.1(1) and were made wards of the court in the custody and supervision of the Missouri Department of Social Services Children's Division, for placement in foster care. Under a service agreement, Mother was ordered to complete a substance abuse assessment and follow its recommendations, attend parenting classes, have supervised visitation as arranged by Children's Division, and obtain full-time employment.

The children were subsequently placed with Father. In September 2001, the court ordered jurisdiction to terminate upon entry of a paternity order. In December 2001, a judgment of paternity, custody and visitation was entered awarding custody of the children to Father, with visitation to Mother. Jurisdiction of the juvenile court was then terminated in December 2001. When jurisdiction was terminated, Mother was residing in the home with the children and Father. At that time, Mother was consistently attending and participating in group counseling at University Behavioral Health Services

---

1. Breckenridge, J., was a member of this court at the time the case was argued and submitted. She was subsequently appointed a judge of the Supreme Court of Missouri but has been reassigned to this court as a special judge for the purpose of disposition of this case.

2. All statutory references are to Revised Statutes of Missouri 2000 unless otherwise indicated.

(UBH), continuing to work their program, starting individual counseling, and was reported to have made significant improvements, although she still had issues with medication compliance.

Father was diagnosed with terminal lung cancer and passed away in November 2002. Prior to Father's death, Mother voluntarily admitted herself to Mid–Missouri Mental Hospital and remained there at the time of his death. Father placed the children with Mother's sister, S.L., before he died, due to Mother's hospitalization and inability to care for them.

During the time the children were residing with S.L., P.X.L. was engaging in inappropriate sexual behaviors with his brother, R.S.L., and other children at school. S.L. entered into an informal adjustment agreement with the juvenile officer wherein she agreed to keep P.X.L. and R.S.L. separated from each other. Despite this agreement, S.L. allowed the children to have unsupervised contact with each other. Consequently, the children were removed from S.L.'s custody and taken into protective custody in October 2003. Mother was not considered an appropriate placement by the Children's Division due to her drug abuse history, her mental health problems, her failure to follow treatment at UBH, her March 2002 conviction for third degree domestic assault, and allegations by the children that they witnessed graphic sexual acts by Mother and her boyfriend. In January 2004, the children were again found to be within the jurisdiction of the court pursuant to section 211.031.1(1) and were made wards of the court and placed in the custody and supervision of the Children's Division for placement in foster care.

The juvenile officer filed petitions for termination of parental rights in May 2005. The juvenile officer also filed, on the same date, the Children's Divisions' recommen-dation for termination of parental rights and investigation and social study. A second investigation and social study was filed with the court in August 2006. Trial was held in October 2006. The trial court entered its judgments on November 15, 2006, terminating Mother's parental rights to P.X.L. and R.S.L., based on abuse and neglect under sections 211.447.4(2)(a), (b), and (d), failure to rectify under section 211.447.4(3), and parental unfitness under section 211.447.4(6). In the judgments, the trial court expressly stated that it admitted "into evidence the investigation and social study pursuant to Section 211.455.3, RSMo." This appeal by Mother followed.

## Standard of Review

To terminate parental rights, the trial court must find by clear, cogent, and convincing evidence that grounds for termination exist under subsections 2, 3, or 4 of section 211.447 and that termination is in the best interests of the child. Section 211.447.5; *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re C.W.*, 211 S.W.3d 93, 99 (Mo. banc 2007). Review of whether clear, cogent, and convincing evidence supports the grounds for termination under subsections 2, 3, or 4 of section 211.447 is governed by the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *P.L.O.*, 131 S.W.3d at 788–89. Accordingly, the trial court's judgment will be upheld unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* The standard of review for the trial court's finding regarding whether termination is in the best inter-

ests of the child is abuse of discretion. *Id.* at 789. In all of these determinations, the appellate court defers to the trial court's findings of fact and considers all the evidence and reasonable inferences in the light most favorable to the judgment. *Id.*

## No Plain Error in Failure to Comply with Section 211.455

■ In her first point on appeal, Mother claims that the trial court erred in admitting into evidence and relying on the investigation and social study prepared by the Children's Division pursuant to section 211.455, because there was not strict and literal compliance with the statute. Mother contends that the trial court violated section 211.455 in this case by accepting the study, which it never ordered and which was filed by the Children's Division on the same day that the petitions for termination of parental rights were filed.[3] Section 211.455.1 provides, "Within thirty days after the filing of the petition, the juvenile officer shall meet with the court in order to determine that all parties have been served with summons and to request that the court order the investigation and social study." The statute requires that the trial court order an investigation and social study and direct "the juvenile officer, the state division of family services or a public or private agency authorized or licensed to care for children or any other competent person" to prepare the study. Section 211.455.3. Mother relies on *In re C.W.*, 211 S.W.3d 93, 96–98 (Mo. banc 2007), which held that the failure to strictly comply with section 211.455 is reversible error.

In *C.W.*, the Children's Division filed its investigation and social study four days before the juvenile office filed its petition for termination of parental rights. 211 S.W.3d at 96. The mother filed her answer and an objection to the study on the grounds that section 211.455 requires the study to be ordered by the court after the petition is filed, not before. *Id.* at 96–97. The court ultimately entered its judgment terminating the mother's parental rights and specifically stated that it took judicial notice of the study. *Id.* at 97.

On appeal, the juvenile office asserted that even if there was not strict compliance with the statute, the mother was not prejudiced, and there was no reversible error. *Id.* The Supreme Court disagreed. It held that section 211.455 requires the trial court to order the mandatory investigation and social study after the petition is filed. *Id.* at 97–98. It further declined to follow the case, *In re A.D.G.*, 23 S.W.3d 717, 719 (Mo.App. W.D.2000), where this court held that the father failed to show how he was prejudiced even if the trial court failed to hold a meeting with the juvenile officer as required by section 211.455. The Supreme Court concluded that "[g]iven the fundamental interests involved, there must be strict and literal compliance with the statutes authorizing the State to terminate the parent-child relationship," and that failure to comply with section 211.455 is reversible error. *Id.* at 98.

■ Unlike in *C.W.*, however, Mother did not object to the study before or at trial and raises her challenge to it for the first time on appeal. She, therefore, failed to preserve this claim for appellate review. Even objections that a juvenile officer or court failed to comply with mandatory requirements of the juvenile code must be properly preserved. *See D.D.C. by Juvenile Officer v. B.C.*, 817 S.W.2d 940, 944

---

**3.** As noted, the Children's Division filed two studies in this case—one with the petition and one over a year later—and Mother does not differentiate between the two in making her argument.

(Mo.App. W.D.1991) (where issue of court's failure to hold a dispositional hearing as mandated by section 210.720, RSMo Cum.Supp.1990, was first raised on appeal, issue not preserved for appeal); *In Interest of H.J.P.*, 669 S.W.2d 264, 271 (Mo. App. S.D.1984) (where parent's claim that written report required under section 211.472, RSMo 1978 (repealed in 1985 and replaced with section 211.455)[4] either was not made or was made but not made available to her prior to trial was not preserved for appellate review because she did not object at trial on either ground).

Mother asserts that since the study was never offered into evidence at trial and no request was made for the trial court to take judicial notice of it, she was not afforded the opportunity to properly object to it. Because section 211.455.3 directs that the written report shall aid the court in determining whether termination is in the best interests of the child, such report is "not required to be formally admitted into evidence or judicially noticed in order to be considered." *In Interest of S.J.G.*, 871 S.W.2d 638, 639 n. 1 (Mo.App. S.D. 1994). And as *C.W.* demonstrates, Mother had notice of the filing of the study and an opportunity to object to its filing even before trial. 211 S.W.3d at 96–97. Additionally, even though the two studies were not offered into evidence during the trial, the Children's Division employee who prepared one of the studies was questioned regarding a portion of the study. Mother did not object to such testimony. Her failure to raise the issue at trial is important because, had she objected to the filing and consideration of the study, the juvenile officer or the trial court would have had an

opportunity to make a record regarding whether the second investigation and social study, filed with the court in August 2006, was prepared and filed in compliance with section 211.455.3.

■ Despite Mother's failure to raise her claim prior to appeal, this court may, at its discretion, review her claim for plain error. Rule 84.13(c). " 'In determining whether to exercise its discretion to provide plain error review, the appellate court looks to determine whether there facially appears substantial grounds for believing that the trial court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice.' " *Gill Constr. v. 18th & Vine Authority*, 157 S.W.3d 699, 723 (Mo.App. W.D.2004) (citation omitted). Pursuant to the Supreme Court's holding in *C.W.*, this court finds that the trial court's failure to strictly comply with the provisions of section 211.455.3 is open and obvious error. Therefore, this court will exercise its discretion to consider whether the trial court's error resulted in manifest injustice or a miscarriage of justice.

Mother contends that the trial court violated section 211.455 in this case by accepting the study, which it never ordered and which was filed by the Children's Division on the same day that the petitions for termination of parental rights were filed. The Supreme Court has held that strict and literal compliance with the mandatory provisions of section 211.455.3 is required and failure to comply is reversible error. *C.W.*, 211 S.W.3d at 98. Reversible error does not equate with the manifest injustice or miscarriage of justice standard of plain

---

4. Section 211.455 expands access of the study to parties, guardians ad litem, and volunteer advocates; mandates a meeting between the juvenile officer and the court within thirty days after petition is filed; and allows for extension of time to serve appropriate parties.

Section 211.455; *In re A.H.*, 169 S.W.3d 152, 156 (Mo.App. S.D.2005). These differences between prior section 211.472, RSMo 1978, and section 211.455 are not significant on the question of whether the issue in this case was preserved for appellate review.

error, however. *Hunsucker v. Fischer*, 221 S.W.3d 433, 435 (Mo.App. W.D.2006).

In determining whether there is manifest injustice or a miscarriage of justice, this court considers that the purpose of the investigation and social study in section 211.455 is "to aid the court 'in determining whether the termination of parental rights is in the child's best interests.'" *A.H.*, 169 S.W.3d at 156 (citation omitted). As will be discussed in greater detail later in this opinion, there is clear and convincing evidence in the record, outside of the studies, that termination of Mother's parental rights was in the best interests of the children. At the time of trial, the children had not been in Mother's custody for six years and did not have consistent contact with her. They suffer from severe behavior problems that Mother is unable to manage given her unwillingness to address her own mental condition and chemical dependency. Because there is overwhelming evidence that termination of parental rights is in the children's best interest, the court's failure to strictly comply with section 211.455 did not result in manifest injustice. Mother's first point is denied.

### Clear, Cogent, and Convincing Evidence of Abuse and Neglect

In points two through six, Mother challenges the trial court's termination of her parental rights under five statutory grounds—abuse and neglect under sections 211.447.4(2)(a), (b), and (d), failure to rectify under section 211.447.4(3), and parental unfitness under section 211.447.4(6). She contends that the trial court's findings on each ground were not supported by clear, cogent, and convincing evidence. Satisfaction of one statutory ground is sufficient to sustain the judgment terminating parental rights. *P.L.O.*, 131 S.W.3d at 789. Thus, this opinion only addresses the trial court's findings that termination of Mother's parental rights was warranted under sections 211.447.4(2)(a) and (b), because the grounds are interrelated in this case.

Section 211.447.4(2) provides that termination of parental rights is appropriate where the child has been abused or neglected. Subsection (a) allows for termination of parental rights for abuse and neglect based on "[a] mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control." Section 211.447.4(2)(a). A showing of more than mere emotional instability or mental problems is required. *In re M.W.S.*, 160 S.W.3d 435, 438 (Mo.App. W.D.2005). "[T]he incapacity must be so severe that it causes the parent to be incapable of providing minimally acceptable care, and the condition cannot be reversed or improved in a reasonable time." *Id.* Section 211.447.4(2)(a) requires the analysis of three prongs to make an adequate finding regarding a mental or emotional condition:

(1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control.

*In re K.A.W.*, 133 S.W.3d 1, 14 (Mo. banc 2004). Subsection (b) provides for termination of parental rights based on a parent's "[c]hemical dependency which prevents the parent from consistently providing the necessary care, custody

and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control." Section 211.447.4(2)(b).

Mother contends that the trial court erred in terminating her parental rights based on these two grounds because no evidence was offered that Mother currently suffers from a mental condition or chemical dependency that renders her unable to provide or prevents her from providing the children with the necessary care, custody, and control. She argues that the juvenile officer's only evidence regarding mental condition and chemical dependency was based on past records and admissions of Mother prior to the assumption of jurisdiction in 2003.

■■■ "A judgment terminating parental rights must be based upon more than past conditions." *C.W.*, 211 S.W.3d at 98. "Findings supporting earlier determinations are not irrelevant, but such findings must be updated to address the parent's current ability and willingness to parent as well as the potential for future harm." *Id.* Past behavior can support termination of parental rights if it is convincingly predictive of future behavior. *Id.*; *K.A.W.*, 133 S.W.3d at 9–10. "There must be a prospective analysis with some explicit consideration of whether past behaviors indicate future harm." *C.W.*, 211 S.W.3d at 98–99.

Contrary to Mother's argument, the evidence presented at trial demonstrated that Mother has suffered and continues to suffer from a mental condition and chemical dependency that renders her unable to provide the necessary care for the children. Mother admitted at trial that she began suffering from mental illness and drug abuse in 1987. She also acknowledged that she had been hospitalized several times between 1987 and 2002 when she voluntarily admitted herself into Mid–

Missouri Mental Hospital prior to Father's death. She currently is unemployed and receives SSI for disability due, at least in part, to her mental condition.

After the children were returned to protective custody in 2003, Mother was not considered an appropriate placement by the Children's Division due to her drug abuse history and her mental health problems and her failure to obtain treatment at UBH. Two goals were identified by the Children's Division for Mother to reunify her with her children—Mother's participation in individual therapy and her maintaining psychiatric services and medication management. The evidence showed, however, that Mother was very inconsistent in meeting these goals. From November 2003 to June 2004, Mother attended Daybreak Treatment Center, a dual-diagnosis treatment center providing residential and outpatient services for individuals diagnosed with an Axis I mental illness and a substance abuse dependency. Upon her admittance at Daybreak, Mother was diagnosed with major depression disorder recurrent, post-traumatic stress disorder, and cocaine dependency in full remission. Although her therapist reported some progress in Mother's treatment in February 2004, Mother was ultimately discharged in June due to inconsistent treatment, attendance, and participation. In the discharge summary, her therapist noted that if Mother did not participate in consistent treatment, sobriety instability would be an issue.

Mother then began individual counseling at Family Counseling Center in July 2004. Records indicate, however, that from July 2004 through September 2005, Mother attended 14 sessions and cancelled or did not show up for appointments 20 times. In February 2006, Mother again began participating in individual therapy twice a month with Family Counseling Center.

Mother's therapist reported in September 2006, "I feel that [Mother] is genuinely ready to be a more responsible parent. I recommend that a revised visitation plan be implemented." Despite this apparent improvement, the therapist also reported that Mother missed four out of ten sessions between June and September 2006.

Mother used UBH for psychiatric services and as her medication management provider after the children were taken into protective custody in October 2003. She, however, was not compliant with UBH. Her psychiatrist at UBH would no longer see her due to her obtaining a duplicate prescription of Xanax from her primary care physician. In February 2004, Mother began a program at New Horizons Community Support Services where she received psychiatric services and medication management services. Those services were terminated unsuccessfully in June 2005 due to Mother's failure to make appointments and follow through with the requirements of the program.

Thereafter, Mother failed to participate in psychiatric treatment other than to obtain medication from Green Meadows Adult Psychiatric Clinic–University Behavioral Health Services from February 2006 to August 2006. Finally, Mother has failed since June 2005 to provide documentation to the Children's Division verifying that she was seeing a psychiatrist or medication management provider.

Regarding her chemical dependency, Mother tested positive for opiates and cocaine in March and April 2000 while pregnant with the children's younger brother, W.L. She tested positive for cocaine in May 2000 while pregnant with W.L. She was not cooperative with substance abuse treatment during her pregnancy. On the day W.L. was born in May 2000, Mother tested positive for cocaine. The baby also tested positive for cocaine and marijuana.

Mother admitted abusing drugs since 1987 and while pregnant with W.L.

After pleading guilty to third degree domestic assault in March 2002, Mother was placed on probation. From March 2002 to July 2004 while on probation, Mother did not have any positive urinalysis. However, Mother tested positive for opiates and cocaine in July 2004. She was then ordered by the court in September 2004 to submit to random urinalysis drug screens. Mother, however, refused random urinalysis requested by Children's Division in November 2004 and January 2005. She finally submitted to random urinalysis screening in June 2006 and tested positive for opiates. Although Mother provided Children's Division with a list of medications she was taking, it was never verified whether the medications could have contributed to the positive test.

The Children's Division caseworker testified that, among other things, concerns with Mother's mental and emotional stability and her substance abuse have impacted Mother's ability to reunify with the children. Regarding Mother's mental and emotional stability, the caseworker testified that she had concerns with Mother's maintaining compliance with her medications and with the directives of her psychiatrist and with her lack of anger control.

The evidence of Mother's struggle with her mental illness and drug abuse since 2000 when the children were initially taken into protective custody and her inconsistency over the years in getting treatment for both is convincingly predictive of future conduct. *C.W.*, 211 S.W.3d at 98; *K.A.W.*, 133 S.W.3d at 9–10. Additionally, given Mother's unwillingness or inability to comply with recommended treatments as documented, the trial court did not err in finding that her mental condition is permanent or such that there is no reasonable likeli-

hood that it can be reversed and that her chemical dependency cannot be treated so as to enable her to consistently provide the necessary care, custody and control of P.X.L. and R.S.L. Sections 211.447.4(2)(a) and (b).

Furthermore, the evidence showed that Mother's mental condition and her chemical dependency are so severe that she is unable to consistently provide the children with the necessary care, custody, and control. *Id.* The statutory purpose of termination of parental rights under section 211.447.4(2)(a) is "to protect the child from the unavoidable adverse consequences of a parent's mental illness." *M.W.S.*, 160 S.W.3d at 438. Clear, cogent, and convincing evidence was presented in this case that the children were harmed and would likely be harmed in the future by a continued relationship with Mother. Both children have severe behavior problems and mental illness. P.X.L.'s behavior problems include aggression and encopresis,[5] and he has been diagnosed with ADHD combined type, oppositional defiant disorder, depressive disorder not otherwise specified. He is prescribed medication, which is imperative in controlling his behaviors. R.S.L.'s behavior problems include lying, stealing, property destruction, and some sexual acting out in the past. He has been diagnosed with ADHD and post-traumatic stress disorder. He sees a psychiatrist and takes medications. Due to their extreme behavior problems and mental illness, both children, despite their young ages, have required placement in residential care, inpatient hospitalization, and/or placement with specially trained foster parents. During his time in the custody of the Children's Division, P.X.L. spent a significant period in residential care. R.S.L.

has been in at least seven placements during his time in protective custody due to an inability to control his behaviors.

Evidence was offered that P.X.L.'s behavioral problems would escalate after contact with Mother. Eventually, visitation with P.X.L. became therapeutic with the child's therapist present. Mother's visitation with both children was very inconsistent over the entire time the children were under the supervision of the Children's Division. Because of the inconsistent visitation and the child's behavioral problems after contact with Mother, P.X.L's therapist recommended that family therapy end in August 2004, and by the time of trial, Mother's visitation with P.X.L. was restricted to one telephone call per week. Similarly, in January 2005, Mother's visitation with R.S.L. was terminated because of inconsistent visits and inappropriate demeanor towards him during visits. Only just prior to trial was visitation with R.S.L. resumed in a family therapy setting. Furthermore, Mother does not acknowledge that P.X.L.'s sexual acting out is inappropriate. Instead, Mother stated to Children's Division that P.X.L.'s behavior is normal for a child his age and that the children would not be having the behavioral issues if they were with her.

The Children's Division caseworker testified that both children require a very structured environment and medication management to keep their behaviors in line. Even with specialized training, consistent participation in the children's therapy, and no history of chemical dependency or mental illness, the children's placement providers have had difficulty maintaining successful placements for them. In marked contrast, the evidence

---

**5.** Encopresis is "involuntary defecation of psychic origin." WEBSTER'S THIRD NEW INTER-NATIONAL DICTIONARY (1993).

showed that Mother's behavior is very unpredictable and unstable. Mother can present as calm and reasonable but becomes upset and irrational for no apparent reason. Until her testimony at trial, Mother had assumed no responsibility for the children being in her care or not being placed in her home. Given Mother's failure to adequately and consistently address her own mental health issues and chemical dependency to improve her overall functioning and her sometimes inappropriate conduct with the children and the children's reactions to her, the trial court did not err in finding that Mother is unable to provide the necessary care, custody, and control of the children. Thus, clear, cogent, and convincing evidence supported the termination of Mother's parental rights to P.X.L. and R.S.L. under sections 211.447.4(2)(a) and (b). The points are denied.

### Sufficient Evidence That Termination of Parental Rights Is In The Best Interests of The Children

In her last point on appeal, Mother claims that the trial court abused its discretion in finding that termination of her parental rights was in the best interests of the children. Once statutory grounds for termination have been proven, the trial court must then find that termination is in the best interests of the child. Section 211.447.5; *In re E.C.H.J.*, 160 S.W.3d 815, 819 (Mo.App. W.D.2005). Under section 211.447.6, the trial court, in considering whether to terminate parental rights, must evaluate and make findings on the following factors when appropriate and applicable:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

Sufficient evidence was presented to support the trial court's finding that termination of Mother's parental rights was in the best interests of the children. The evidence showed that the children have few, if any, emotional ties to Mother. Except for the year the children lived with Mother and Father before Father's death, the children had not been in Mother's custody for six years at the time of trial. P.X.L. was five years old and R.S.L. was two years old when they were first taken into protective custody in 2000. P.X.L. does not ask about Mother, and, as one therapist noted, his acting out after having contact with her may be indicative of his negative feelings for her. Although R.S.L. has slightly more emotional ties to Mother than P.X.L., his ties are not strong, and when he does ask about her, it is usually in

terms of what kind of snack or gift she will bring to him.

Furthermore, Mother has not maintained regular contact with the children and instead has been very inconsistent and sometimes inappropriate with her visitation. She has cancelled several visits, some without notice. Her contact with the children has never progressed beyond a supervised setting and, in fact, has been restricted due to the detrimental effect such contact has on the children. "The length of time a child is out of a parent's custody and the limited contact during that time is an appropriate consideration when evaluating the children's emotional ties with their parent." *E.C.H.J.*, 160 S.W.3d at 820.

The evidence further revealed that Mother has refused to consistently participate in the services recommended by the Children's Division, such as therapy and medication management, to bring about stability in her life and reunification with her children. Such conduct demonstrated a disinterest in or lack of commitment to the children. Also, the Children's Division's caseworker testified that given Mother's unwillingness to cooperate with the recommended services, no other additional services would likely bring about lasting parental adjustment to allow Mother to manage the children's severe behavior problems that even stable foster caregivers are barely able to handle. The trial court did not abuse its discretion in finding that termination was in the best interests of the children. The point is denied.

The judgments of the trial court are affirmed.

All concur.