288 S.W.3d 787 (2009)
In the Interest of W.C., M.M., W.M. and G.M.
No. ED 91354.
Missouri Court of Appeals, Eastern District, Division One.
June 16, 2009.
*788 Christina L. Kime, Piedmont, MO, for Appellant, Julie Minx.
Nathaniel J. Bollinger, Fredericktown, MO, for Appellant, James Carrigan.
*789 Tammy Steward, Farmington, MO, for Respondent, Jerry Chamberlain.

OPINION
GLENN A. NORTON, Judge.
J.M. ("Mother") appeals the judgment of the juvenile court terminating her parental rights to W.C., M.M., W.M. and G.M.[1] We reverse and remand as to Mother.
J.C. ("Father") appeals the judgment terminating his parental rights to W.C. and M.M.[2] We find that the juvenile court did not err in terminating his parental rights. Because an extended opinion as to Father would have no precedential value, the judgment terminating his parental rights is affirmed pursuant to Rule 84.16(b).

I. BACKGROUND
Mother is the natural mother of W.C., a daughter born on December 28, 1999, and sons M.M., born on October 21, 1996, W.M., born on February 24, 2001, and G.M., born on November 13, 2002. Garry M. is Mother's husband and the natural father of W.M. and G.M. At the time the Children's Division became involved with the family, all four children were living with Mother and Garry.[3]

A. Conditions Leading to Juvenile Court Jurisdiction
On October 13, 2004, the Children's Division received a child abuse and neglect report alleging unsanitary living conditions at Mother's household. When the Division arrived to inspect the home, they found raw sewage in the yard and old food and animal feces inside the home. There were no bed linens. The children were dirty and unkempt and had untreated lice infestations. The children were removed from the home but returned the next day after the Division assisted Mother and Garry in obtaining appropriate housing at a hotel.
The Division returned for a home visit on November 17 and 18. Again, the home was found to be in a deplorable condition with animal feces on the floor and food smeared on the wall. There were no utilities and the children were dirty. M.M. had flea bites on his arms and W.M. had a large oozing burn on his arm. The Division removed the children and assisted Mother and Garry in cleaning up the home. The children were returned on November 23.
The Division made a final visit to the home on January 3, 2005, but Mother denied the Division workers access to the home. The Sheriff's Department determined it was not safe to pursue arguing with Mother and Garry that evening. Instead, the Sheriff's Department arrived the following day and obtained custody of the children. The children remained in foster care for the remaining duration of the case.

B. Petition to Terminate Parental Rights
In December 2007, the juvenile officer filed a petition to terminate the parental rights of Mother, Father, and Garry. In addition to alleging that the children were abandoned by Garry, the juvenile officer alleged that: (1) the children were abused and neglected under section 211.447.5(2);[4] *790 (2) the children have been under the jurisdiction of the juvenile court for more than one year and conditions of a potentially harmful nature continue to exist under section 211.447.5(3); and (3) all three parents are unfit to be a party to the parent-child relationship under section 211.447.5(6).

C. Testimony at Hearing on Juvenile Officer's Petition to Terminate Parental Rights
At the hearing on the juvenile officer's petition to terminate parental rights, the parties presented evidence from several witnesses about various topics relating to the juvenile officer's allegations. Each subject will be discussed separately below.

1. Allegations of Drug Use
The Chief Deputy Juvenile Officer, Kim Johnson, testified that she began working on the case in October 2004, when the children were first removed from Mother's home. Johnson explained that "throughout this whole case, drugs have been an issue with both parents." In particular, she testified that a surface test for methamphetamines was performed on the children on January 5, 2005, the day after the Division placed them in foster homes. Pamela Herzog, a children's services worker assigned to the case from October 2004 until January 2005, discussed the results of the test. She stated that W.M. was found to have a trace amount of methamphetamine on his temple and a strong amount on his shoes. In addition, a trace amount of methamphetamine was discovered on M.M.'s and G.M.'s shoes. During her testimony, Johnson acknowledged that Mother told her the shoes were recently purchased at a yard sale.
On January 5, 2005, Herzog obtained a search warrant to search Mother's home. She agreed that she had not actually seen any of the items listed in the affidavit used to obtain the warrant, but stated that the agency directed her to sign the affidavit.[5] No illegal items were seized when the search warrant was executed.
The following April, the case manager who succeeded Herzog, Patty Cluck, took items from Mother's home to further investigate alleged use of drugs. According to Cluck, the Division was primarily concerned with drug use by Garry. The items, taken with Mother's permission, included a floor mat from Garry's car and a toy purse from the children's toy box. Both tested positive for methamphetamine. Cluck did not discuss the positive test results with Mother.
On April 13, 2005, Mother entered into a social service plan agreement with the Division which required her to submit to random drug testing.[6] The record indicated that Mother tested positive for methamphetamine once, on April 26, 2005. According to Mother, she believed she may have tested positive because she was taking over-the-counter cold medication at the time. Mother missed two tests in May and June 2005. She explained that she could not afford the tests and was having transportation problems. At the time, Mother was unemployed. The Division treated both missed tests as positive drug *791 screens. Mother tested negative for the presence of drugs for all of the remaining seven drug tests. The drug and alcohol assessment required by the service plan agreement concluded that Mother did not need treatment for drugs or alcohol.
Two years later, in April 2007, after Tabitha Randall became the case manager, the Division received a call from someone identifying himself as Mother's brother.[7] Randall testified that Mother's brother told her he had seen Mother and Garry using methamphetamines in their home the previous night. When the Division arrived to investigate, Mother took a drug test and consented to a search of her home. Mother tested negative for methamphetamine. In the search, the Division obtained a drug screen kit. Mother told Randall that the kit was purchased to test her brother's girlfriend who had a history of drug use. Investigators also found clear plastic tubing in the loveseat in the living room. Mother stated she did not know how the tubing got there, but that her brother's girlfriend slept on the loveseat.
The Division later determined that Mother's brother was at work during the time he alleged he saw Mother and Garry using drugs at Mother's home. Randall acknowledged that they therefore could not determine whether Mother's brother's allegations were true. No charges were filed. Moreover, in the same May 2007 court report describing Mother's brother's allegations, the Division recommended increased visitation between the children and Mother, with the goal of reunifying Mother with the children at the end of the school year.

2. Allegations of Abuse
Patty Cluck testified about the Division's concerns that Garry physically abused the children. She described Garry as aggressive and violent. According to Cluck, the Division received hotline calls soon after the children were removed from Mother's home alleging physical and sexual abuse by Garry, including an allegation that Garry cut G.M.'s stomach with a knife. Cluck acknowledged that the abuse allegations were found to be unsubstantiated after a Division investigation.
Darlene Curtis, the foster parent for W.M. and G.M., testified that both children told her that Garry beat them with a belt. She also noticed that "they have scars on them." In addition, W.C.'s foster mother, Angela Miller, testified that W.C. told her Garry burned her when she got into trouble. Miller stated that she has observed a "little, tiny spot" on W.C.

3. Compliance with Social Service Plan Agreement
The Division presented evidence of Mother's compliance with her April 2005 social service plan agreement through Cluck's testimony. In addition to requiring Mother to submit to random drug testing, the agreement required Mother to participate in a variety of services, including psychological and substance abuse assessments, counseling, weekly visitation, and family support team meetings. Mother also agreed to keep a stable home environment and obtain employment. She agreed to keep the Division advised of any changes of address or changes in the composition of her household. Finally, Mother *792 agreed to pay child support of at least $105.00 per month.
Cluck testified that Mother completed almost all of the requirements of her social service plan agreement. For instance, Mother completed a drug and alcohol assessment, attended counseling, completed a psychological assessment, attended visitation with the children, provided the children with gifts and snacks, and obtained stable housing and employment. Cluck did not specifically state whether Mother paid child support. According to Cluck, Mother's non-compliance consisted of missing two of ten drug screens, not completing a psychological assessment within ninety days, and not obtaining employment within sixty days. Mother eventually did complete the assessment and obtain employment. Cluck agreed that, in her experience, about half of the people finish the requirements in a social service plan within the allotted time, but the other half need more time.

4. Ability to Parent Children
Diane Hartman, a clinical social worker assigned to assist Mother through therapy, testified that Mother made great progress throughout the duration of her weekly sessions. At the time that Hartman was meeting with Mother, Hartman recommended extended unsupervised visits going into weekend visits with the children. She believed that Mother was very serious about leaving Garry and keeping him out of her life. She recalled that Mother and Garry separated in November 2005. Hartman testified that during her April 2006 therapy sessions with Mother, Mother expressed negativity and frustration toward Garry for failing to comply with the requirements of his social service plan agreement.
Hartman stated that she remembered Mother's visitation was changed back to supervised visitation after the children mentioned that they had seen Garry during the summer of 2007. Hartman believed that the contact was not arranged. She agreed that, generally, if Mother continued contact with Garry, "it would be a problem." Hartman also stated that if, over the duration of the case, Mother had one positive drug screen and two alleged contacts with Garry, she was not concerned about Mother's ability to reunite with the children. Finally, Hartman testified that "[a]bsolutely [Mother] was not actively seeking the contacts" with Garry.
Darlene Curtis, foster parent for W.M. and G.M., testified that she brought the children to Mother's home for several home visits. She stated that over the course of the visits, Mother displayed some difficulty parenting the children, but that Mother "could have pulled it off." She testified that Mother loves her children, and the children love Mother.
Curtis's only concern was Mother's continued contact with Garry. She explained that the children mentioned seeing their father during an unsupervised weekend visit with Mother in the summer of 2007, after Garry was ordered by the court to have no further contact with the children due to non-compliance with his social service plan agreement. Curtis agreed that children of W.M.'s and G.M.'s age have difficulty with time frames, but she found their conversation suspicious because she heard W.M. say "Remember, we can't say anything. Don't tell anything." According to Curtis, after hearing W.M. and G.M. talk about seeing Garry, the Division required Mother to sign a visitation agreement, dated June 15, 2007, stating that Garry could not have contact with the children during her unsupervised visits, as ordered by the court. Curtis acknowledged that Mother filed for divorce from Garry in April 2007, but she recalled that at a family support team meeting the following August, Mother made a statement *793 that she would never totally let Garry go because he was the children's father.
Angela Miller, W.C.'s foster mother, testified that W.C. also mentioned seeing Garry during the summer of 2007. As to W.C.'s bond with Mother, Miller believed that W.C. loves her mom and wants to go home. However, according to Miller, W.C. is afraid of Garry.
Julie Downs, a licensed clinical social worker assigned to work with W.M. and to provide family therapy with the children and Mother, also testified about Mother's ability to parent her children. She stated that although Mother struggled with parenting four children, with support during the transition to reunification, she believed Mother could parent them. Downs stated that Mother did not need additional services, but would need the existing services to continue. Downs agreed that Mother should not be reunified with the children if it was true that Mother claimed she could not guarantee Garry would not be part of the children's lives. Downs testified that either way, the children needed a permanent placement.
When questioned about Garry's possible contact with the children, Downs testified that W.M. mentioned seeing Garry around August 2007, when Mother's unsupervised visits were suspended. Downs stated that it was hard to discern a time frame for when the contact would have occurred. She agreed that since W.M. only stated that he saw Garry in the "summer," it could have been a previous summer when W.M. was allowed contact with Garry. Additionally, the contact could have occurred before Mother signed a June 2007 visitation agreement preventing her from having contact with Garry during unsupervised visits.
Chief Deputy Juvenile Officer Kim Johnson, who was involved in the case since its inception in October 2004, discussed the final contact with Garry in August 2007 that suspended Mother's visitation just before the Division was set to reunify Mother with the children. Johnson testified that she noticed Garry driving Mother's truck and decided to follow him. According to Johnson, Garry drove to Mother's house, walked up to the front door and was about to open it when Johnson pulled up and asked him what he was doing and whether he lived there. Garry told Johnson that he did not live there and that he thought Mother was at work. He knocked on the door and no one answered. Johnson then left. Later that month, the Division held a family support team meeting to discuss the truck incident with Mother. Johnson testified that, at the meeting, Mother told her Garry could drive the truck since he pays for it. She stated that Mother then said "I'm not going to keep the kids from him any time because he's the father."
Tabitha Randall, Mother's case manager since September 2006, also spoke about Mother's statements during the family support team meeting. She explained that Mother told her Garry was driving the truck because he and his father were fixing it. Randall also testified that, at the meeting, Mother admitted that she maintained verbal contact with Garry "because he is the father of her children [and] that he had a right to know about his kids and that she could not, basically not keep in contact with him, or would not stop contact with him." Randall agreed that she got "the impression" from Mother's statement that Mother would not keep Garry away from his children. After reviewing the court report written just after the meeting took place, Randall acknowledged that her description of Mother's statement at the time of the meeting was: "[Mother] admitted that she still had verbal contact with [Garry] and stated that she would let him know about his children. She stated that *794 she had not informed him to stay away from her due to a court order."
Randall testified that at the August 2007 family support team meeting, the Division was still considering reunification of the children with Mother. When asked why the juvenile officer decided to file a petition to terminate Mother's rights the following December, Randall replied that the cause of the Division's change in opinion was "[t]he fact that we had more evidence that [Garry] was present during visitations over the summer." Randall recognized that the only "evidence" of Garry visiting with the children were statements from W.M. and W.C. that they had seen him. She stated that Mother did admit contact with Garry, but acknowledged that Mother did not say she permitted any contact between the children and Garry.
M.M., who at the time was eleven years old, testified in camera about his relationship with Mother. M.M. stated that he has good feelings about his mother and feels safe with her. He told the court that he wants to live with his mom. He could not remember the last time he had seen Garry, but stated that he loves Garry and is not afraid of him. He also testified that neither Mother nor Garry have ever hit him and that he has never seen them hit any of his siblings, although Garry has yelled at him.
After all witnesses testified, the trial court received into evidence an affidavit from Mother's attorney stating that Mother filed for divorce from Garry on April 5, 2007, but that the divorce case was not currently able to proceed since the juvenile court has jurisdiction over the children.

5. Guardian Ad Litem's Testimony Regarding Best Interests of the Children
After the conclusion of evidence, the court questioned the children's guardian ad litem ("GAL") about whether he believed termination of Mother's parental rights was in the best interests of the children. The GAL initially declined to give a recommendation because he had only recently been appointed. After the court explained that it was his job to give a recommendation, the GAL informed the court that he did not believe it was in the best interests of any of the four children to terminate the parental rights of Mother at that time.

D. The Juvenile Court's Judgment
In its judgment, the juvenile court terminated the parental rights of Mother based on grounds of abuse and neglect under section 211.447.5(2), failure to rectify under section 211.447.5(3) and unfitness under section 211.447.5(6).[8] This appeal follows.

II. DISCUSSION

A. Standard of Review
We will affirm the juvenile court's judgment terminating a parent's parental rights unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. In re P.L.O., 131 S.W.3d 782, 788-89 (Mo. banc 2004). We defer to the fact-findings of the juvenile court and consider all evidence and reasonable inferences in the light most favorable to the judgment. Id. at 789.
As stated in In re K.A.W., "[t]he constitutional implications of a termination of parental rights also inform the standard of appellate review." 133 S.W.3d 1, 12 (Mo. banc 2004). Because a parent's right *795 to raise his or her children is a fundamental liberty interest protected by the constitutional guarantee of due process, appellate courts must examine the juvenile court's findings of fact and conclusions of law closely. Id. Moreover, "[s]tatutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." Id.

B. The Juvenile Court Erred in Terminating Mother's Parental Rights under Section 211.447.5(2)
Mother argues in her first point that the juvenile court erred in terminating her parental rights to the children because there was no clear, cogent, and convincing evidence to support a finding that she abused or neglected the children under 211.447.5(2).[9] Section 211.447.5(2) permits the juvenile court to terminate a parent's parental rights when clear, cogent and convincing evidence indicates that the child has been abused or neglected. See section 211.447.6 (permitting the juvenile court to terminate a parent's parental rights when it appears by clear, cogent and convincing evidence that grounds for termination under section 211.447.5 exist). "Clear, cogent and convincing evidence" is described as evidence that "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re E.D.M., 126 S.W.3d 488, 492 (Mo.App. W.D.2004).
When determining whether a child has been abused or neglected under section 211.447.5(2), the court is required to make specific findings on each of the four factors listed in subsections (a) through (d). K.A.W., 133 S.W.3d at 16. Even if a factor is not relevant to the case, the court should state why the given factor is not relevant. Id. Here, the juvenile court found that Mother did not have a mental condition rendering her unable to knowingly provide the children with necessary care, custody and control under section 211.447.5(2)(a). Thus, we discuss only the remaining three factors below.

1. The Juvenile Court's Finding under Section 211.447.5(2)(b) Regarding Chemical Dependency Does Not Support Termination of Mother's Parental Rights and Is Not Supported by Clear, Cogent and Convincing Evidence
Section 211.447.5(2)(b) requires the juvenile court to consider whether the parent suffers from a chemical dependency which cannot be treated and which prevents the parent from consistently providing the necessary care, custody and control of the child. In its judgment, the juvenile court found that Mother did not have a known chemical dependency which prevents her from consistently providing necessary care, custody and control. Nevertheless, the court then recited evidence of alleged drug use based on the surface samples taken when the children were removed from the home, Mother's positive test for methamphetamine in one of her drug screens, and drug paraphernalia found near the home during the May 2007 search.
Mother argues that there is no clear, cogent and convincing evidence to support a finding that she suffers from a chemical dependency rendering her unable to care for her children. We agree. The juvenile court specifically found that Mother did not suffer from such a chemical dependency. Therefore, it cannot rely on this factor as support for a determination that Mother abused or neglected her children under section 211.447.5(2). We also note that the evidence to which the court refers in its *796 finding under section 211.447.5(2)(b) is insufficient to support a finding that Mother suffered from a chemical dependency. See In re C.A.L., 228 S.W.3d 66, 71 (Mo.App. S.D.2007) (noting and agreeing that the juvenile court found that mother did not suffer from a chemical dependency rendering her unable to care for her child even though the court did find mother had a history of drug use). When compared to evidence in oppositionMother's explanation for the surface test results, Mother's numerous negative drug screens, and the Division's inability to determine the validity of Mother's brother's accusation that Mother was using drugs with Garrywe cannot say that the surface test results, Mother's single positive drug screen, and the presence of some drug paraphernalia items at Mother's home instantly tilt the scales in favor of a finding of chemical dependency rendering Mother unable to appropriately care for the children. See E.D.M., 126 S.W.3d at 492. Accordingly, the juvenile court's finding under section 211.447.5(2)(b) does not support termination of Mother's parental rights under section 211.447.5(2) and is not supported by clear, cogent and convincing evidence.

2. The Juvenile Court's Finding Regarding Acts of Abuse Toward the Children under section 211.447.5(2)(c) Is Not Supported by Clear, Cogent and Convincing Evidence
Under Section 211.447.5(2)(c), the juvenile court must consider whether there has been a
severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent ... or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family....
The juvenile court found that Mother knew or should have known that Garry abused the children based on the hotline call resulting from the statements of W.M. and G.M. that Garry cut G.M., W.C.'s statement that Garry burned her, and the presence of scars on G.M. and W.C. evidencing the abuse. It also found that Mother's relationship with Garry "is purportedly violent" because she applied for an ex parte order of protection against Garry in April 2006.
We agree with Mother that the record lacks clear, cogent and convincing evidence to support a finding of severe or recurrent acts of abuse. First, as Mother notes, the report on the hotline call regarding W.M. and G.M. was found by the Missouri Department of Social Services to be unsubstantiated. As support for Mother's knowledge that the acts occurred, the court notes that Mother's name was listed as the "significant other" on the abuse reports. Although the abuse reports are not part of the record on appeal, testimony at trial indicated that the abuse occurred before the children were removed from Mother's custody. However, other than Mother's status as the children's custodian, there is no evidence in the record that Mother knew or should have known of Garry's alleged abuse. Therefore, no clear, cogent and convincing evidence supports a finding that Mother knew or should have known that Garry abused the children.
We further agree with Mother that there is no evidence indicating that Mother's "purportedly violent" relationship with Garry has a connection to any alleged abuse of the children by Garry. Thus, the juvenile court erred in finding that grounds existed for termination based on section 211.447.5(2)(c). See In re A.M.C., 983 S.W.2d 635, 638-39 (Mo.App. S.D.1999) (finding that evidence of physical, emotional or sexual abuse failed to rise to the level of clear, cogent and convincing because *797 investigator testifying that the mother was aware of sexual abuse by the father failed to furnish any details or basis for his conclusions and nothing in the record otherwise supported conclusions).

3. The Juvenile Court's Finding that Mother Repeatedly and Continuously Failed to Provide for the Children Under Section 211.447.5(2)(d) Is Not Supported by Clear, Cogent and Convincing Evidence
Section 211.447.4(2)(d), requires the juvenile court to consider whether there has been a
[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.
In its judgment, the juvenile court found that Mother repeatedly and continuously failed to provide for her children because of the deplorable conditions of Mother's home at "the beginning of the case" and because Mother has not contributed to the cost of care for the children.
We agree with Mother that the juvenile court's finding is not supported by clear, cogent and convincing evidence. First, its reference to the conditions of Mother's home when the children were taken into custody is insufficient to support a finding of a continuous and repeated failure to provide under section 211.447.5(2)(d). "While past behavior is one component of finding grounds for termination, the circuit court must also assess the extent to which past behavior is predictive of similar issues in the future." In re C.W., 211 S.W.3d 93, 98 (Mo. banc 2007). Accordingly, findings supporting termination of parental rights must be updated to address the parent's current ability and willingness to parent as well as the potential for future harm. Id. Specifically, "[t]here must be a prospective analysis with some explicit consideration of whether past behaviors indicate future harm." Id. at 98-99.
Under section 211.447.5(2)(d), the juvenile court is specifically required to consider whether there has been a "continuous or repeated failure" by the parent. While the juvenile court in this case discussed Mother's past failure, it did not make a finding which indicated a consideration of whether Mother's past behaviors indicate future harm. Evidence in this case demonstrated that after the children came under court jurisdiction, Mother was able to obtain suitable housing and employment. There was no evidence that Mother's living conditions at the time of trial were in any way similar to the conditions in which the Division found them in October 2004.
With regard to the juvenile court's findings on financial contributions, there is evidence that Mother provided numerous gifts, including snacks, small amounts of money, and toys. Mother also notes in her argument that while there was no specific evidence indicating that she paid the $105.00 per month in child support required under the social services plan agreement, Division workers testified and the court found that she generally was in compliance with the agreement. As stated in In re K.M., 249 S.W.3d 265, 272 (Mo. App. W.D.2008), overruled on other grounds by In re M.N., 277 S.W.3d 843, 845 (Mo.App. W.D.2009), "[c]ontribution, no matter how minimal, demonstrates a parent's intent to continue the parent-child relationship." Further, "[a] parent is not required to pay for all of a child's financial needs, but only as much as he or she reasonably can." Id. The juvenile court's finding that Mother has not contributed to the cost of care for her children is therefore *798 not supported by clear, cogent and convincing evidence.

4. Conclusion
We find that there is no clear, cogent and convincing evidence to support the juvenile court's determination that grounds exist for termination of Mother's parental rights under section 211.447.5(2). Mother's first point is granted.

C. The Juvenile Court Erred in Terminating Mother's Parental Rights under Section 211.447.5(3)
In her second point, Mother argues that the juvenile court erred in terminating her parental rights based on section 211.447.5(3) because its findings under this ground were not supported by clear, cogent and convincing evidence. Section 211.447.5(3) permits the juvenile court to terminate a parent's parental rights on the ground that the children have been in the care of the juvenile court for a period of at least one year and either: (1) the conditions which led to assumption of jurisdiction still persist; or (2) conditions of a potentially harmful nature continue to exist. In addition, there must be little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future. Id.
In deciding whether to terminate on this "failure to rectify" ground, the juvenile court must make findings on the following four statutory factors: (a) the terms of a social service plan entered into by the parent and the Division and the extent to which the parties have made progress in complying with those terms; (b) the success or failure of the efforts of the juvenile officer, the Division or other agency to aid the parent on a continuing basis in adjusting her circumstances or conduct to provide a proper home for the child; (c) a mental condition which renders the parent unable to knowingly provide the child the necessary care, custody and control; and (d) a chemical dependency which prevents the parent from consistently providing the child the necessary care, custody and control. Section 211.447.5(3)(a)-(d). In this case, it is undisputed that the children have been in the care of the juvenile court for more than one year. We discuss the remaining statutory requirements below.

1. The Juvenile Court's Finding that Conditions of a Potentially Harmful Nature Continue to Exist is Not Supported by Clear, Cogent and Convincing Evidence
In its judgment, the juvenile court generally found that grounds exist under this section because "conditions of a potentially harmful nature continue to exist." Specifically, the juvenile court determined that, despite serious allegations of physical abuse by Garry, his threatening behaviors, his positive drug screens, and his general lack of compliance with court orders, Mother still stated her intention to continue contact with Garry at the August 2007 family support team meeting. The court was also concerned that the children reported seeing Garry during unsupervised visitation in violation of the court's orders. Thus, the court found that there was little likelihood the children could be returned to Mother in the near future.
We agree with Mother that the juvenile court's finding that conditions of a potentially harmful nature continue to exist is not supported by clear, cogent and convincing evidence. In doing so, we acknowledge our holding in In re L.D.R. that "[a] parent's continued exposure of his children to someone whom he knows is harmful to their well-being can, under certain circumstances, constitute a potentially harmful condition that would justify termination under section 211.447.[5](3) if not rectified." 169 S.W.3d 137, 141 (Mo.App. E.D.2005). However, we find that the circumstances *799 in this case are distinguishable from those in L.D.R.
In L.D.R., this Court affirmed the juvenile court's decision to terminate a father's parental rights based on section 211.447.5(3) (at the time codified as section 211.447.4(3)) because the Division presented clear, cogent and convincing evidence that the father was unable or unwilling to protect the children from their mother, a violent drug addict who previously abandoned the children and failed to provide for them. Id. at 141. In particular, we noted that the mother was present during every visit attended by a parent aide at the father's house despite a court order prohibiting him from allowing contact between the mother and the children during visitation. Id. The father specifically admitted that the mother would come and go when she wanted to and has always been able to do so, even within the last two weeks before trial. Id. He described his relationship with the mother as one of "cohabitation and love." Id. The record also demonstrated that the father maintained his relationship with mother even though she had set the father's truck on fire, thrown gasoline on his house, threatened to burn the house down, and stolen his cars and sold them for drugs, with some of these incidents occurring fairly recently to trial. Id. at 141-42. Finally, the mother's cousin testified that she heard the mother state that she wanted the father to have custody of the children so that she could come over and take care of them. Id. at 142. In affirming termination of the father's parental rights, we reasoned that even though the father had made significant progress in complying with his social service plan, there was ample evidence that despite progress with the plan, the father would not be able to rectify the harmful condition of contact with the mother in the future. Id. at 142-43.
Unlike in L.D.R., we find that the record in this case is insufficient to support a finding that Mother continued to expose the children to Garry. Reviewing the transcript, it appears that several members of the family support team had a general recollection that Mother stated she would either never totally let Garry go, could not guarantee that Garry would not be a part of the children's lives, or was "not going to keep the kids from him any time because he's the father." The description of Mother's statement at the time of the meeting was that "she still had verbal contact with [Garry] and stated that she would let him know about his children." According to the description, Mother also had not informed Garry to stay away from her due to a court order. These statements fail to clarify whether Mother insisted on allowing Garry to maintain contact with the children or whether Mother individually continued to stay in contact with Garry without permitting any communication between him and the children.
Further, evidence also indicated that it was unclear when the alleged contact between Garry and the children occurred. Unlike the father in L.D.R., no evidence implied that Mother arranged the contact with Garry. Witnesses acknowledged that it could have happened before Mother entered into the June 2007 safety agreement ensuring that she would not allow the children to have contact with Garry. In addition, rather than continuing to describe her relationship with Garry as viable, evidence shows that Mother filed for divorce and that Mother expressed her intention to leave him permanently. "It has been said that the clear, cogent and convincing standard requires that the matter under consideration be established by the clearest of evidence, and upon testimony entirely exact and satisfactory." In re B.S.B., 76 S.W.3d 318, 332 (Mo.App. W.D.2002) (internal *800 citations omitted). Considering the record before us, we cannot say that clear, cogent and convincing evidence supports a finding that conditions of a potentially harmful nature continue to exist based solely on evidence that the children may have seen Garry at some point during the summer of 2007 or that Mother may still have verbal contact with him.

2. The Juvenile Court's Findings on the Relevant Statutory Factors Do Not Support Termination of Mother's Parental Rights under Section 211.447.5(3) or are Not Supported by Clear, Cogent and Convincing Evidence
We also agree with Mother that the juvenile court's findings on the four statutory factors do not support termination of her parental rights under section 211.447.5(3). First, the juvenile court found that Mother was in compliance with her social service plan agreement. See section 211.447.5(3)(a). Although we recognize that "compliance with a service agreement does not prevent the scales of justice from `instantly tilting' in favor of the findings of the juvenile court," L.D.R., 169 S.W.3d at 142 (internal citations omitted), a parent's efforts to comply with a social service plan "will provide the court with an indication of the parent's likely efforts in the future to care for the child." In re S.M.H., 170 S.W.3d 524, 532 (Mo. App. E.D.2005). In any event, Mother's compliance with her social service plan agreement weighs in her favor given the lack of clear, cogent and convincing evidence to support termination.
Second, as to the Division's efforts to assist Mother in adjusting her circumstances or conduct to provide a proper home under section 211.447.5(3)(b), the juvenile court found that the services provided to Mother failed because Mother "continually fails to provide the necessary safety and stability for her children." The juvenile court's finding is based on Mother's alleged willingness to permit Garry to continue contact with the children. As we have already concluded that the juvenile court's determination in this regard is not supported by clear, cogent and convincing evidence, the juvenile court's finding under this statutory factor does not support termination.
Third, the juvenile court found that Mother did not have a mental condition under section 211.447.5(3)(c). Finally, in discussing whether Mother has a known chemical dependency under section 211.447.5(3)(d), the juvenile court repeated the same finding and comments discussed with respect to section 211.447.5(2)(b), consideration of a known chemical dependency under the abuse and neglect ground. Based upon our analysis in Section II.B.1 of this opinion, we conclude that the juvenile court's finding on section 211.447.5(3)(d) does not support termination of Mother's parental rights.

3. Conclusion
Considering our discussion of the juvenile court's general finding that conditions of a harmful nature potentially exist and its specific findings under the statutory factors, we find that there is no clear, cogent and convincing evidence to support the court's determination that grounds exist for termination of Mother's parental rights under section 211.447.5(3). Mother's second point is granted.

D. The Juvenile Court Determination that Grounds Exist for Termination of Mother's Parental Rights under Section 211.447.5(6) Is Not Supported by Clear, Cogent and Convincing Evidence
Mother argues in her third point that the juvenile court erred in finding that grounds exist for termination of her parental rights under section 211.447.5(6). Section 211.447.5(6) permits the court to *801 terminate a parent's parental rights if it appears by clear, cogent and convincing evidence that:
[t]he parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to, abuses as defined in section 455.010, RSMo, child abuse or drug abuse before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.
In its judgment, the juvenile court determined that Mother was unfit to be a party to the parent-child relationship because she subjected her children to "specific conditions that directly relate to the parent-child relationship" rendering her unable to care for her them for the reasonably foreseeable future. In describing these "specific conditions," the juvenile court explained that although Mother has successfully received services, she continues to be "non-compliant" because she "refuses to protect her children from Garry." The court also found that Mother "repeatedly violates court orders and safety agreements by continually allowing [Garry] to be around her children." It questioned Mother's truthfulness about the children's contact with Garry, especially because of testimony that the children were secretive about their visits with Mother. The juvenile court's remaining concern was with the conditions in which the children were found when they first came into care. The court concluded by finding that the safety of the children cannot be ensured if they return to Mother's care.
We agree with Mother's assertion that there is no clear, cogent and convincing evidence to support the trial court's finding that Mother "repeatedly violates court orders and safety agreements by continually allowing [Garry] to be around her children." As discussed above, the evidence regarding Garry's contact with the children while they were in Mother's custody is unclear, consisting of testimony that the children may have seen Garry once over the summer, possibly before Mother entered into the safety agreement prohibiting her from allowing Garry any contact with them. We fail to see how this evidence amounts to a finding that Mother "continually" allowed Garry to be around the children. Any other evidence involved possible contact between Mother and Garry, not Garry and the children.
The juvenile court's discussion of the children's condition when taken into custody also does not support termination of Mother's parental rights. As stated in K.A.W.,
[p]ast abuse alone cannot be a basis for terminating parental rights under subdivision (6). Instead, the abuse must be of such a duration and nature that the trial court determines that the parent will not remedy the problem and so it renders the parent unfit for the reasonably foreseeable future.
133 S.W.3d at 20. Thus, the juvenile court must determine that the parent is currently unfit to be a party to the parent and child relationship, supported by findings as to acts or conditions that persist at the time of termination. Id. at 20-21. Here, the juvenile court mentioned the children's condition when taken into custody but did not explain how that condition persisted at the time of termination. Thus, the juvenile court's finding regarding the children's condition did not adequately support *802 termination under section 211.447.5(6).
We find that there is no clear, cogent and convincing evidence to support termination of Mother's parental rights under section 211.447.5(6). Accordingly, we grant Mother's third point.

E. It is Unnecessary to Determine Whether Termination of Mother's Parental Rights is in the Best Interests of the Children
In her fourth and final point, Mother argues that the juvenile court erred in finding that termination of her parental rights was in the best interests of the children. Section 211.447.6 allows a juvenile court to terminate a parent's parental rights "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination." Id. (emphasis added). Because we conclude that there was no clear, cogent and convincing evidence to support a determination that grounds exist for termination, it is unnecessary for us to determine whether termination of Mother's parental rights is in the best interests of the children.

III. CONCLUSION
The juvenile court's judgment is affirmed as to Father under Rule 84.16(b). The juvenile court's judgment is reversed and remanded as to Mother.
KURT S. ODENWALD, P.J., and PATRICIA L. COHEN, J., concur.
NOTES
[1] The individual cases for each child were consolidated for purposes of the juvenile court's judgment and this appeal.
[2] The parental rights of Garry M., father of W.M. and G.M., were also terminated by the juvenile court. Garry M. does not appeal the juvenile court's judgment.
[3] Father was incarcerated from the time the juvenile court took custody until his parental rights were terminated.
[4] Unless otherwise indicated, all statutory references are to RSMo Supp.2007. In the juvenile officer's petition, the juvenile officer refers to the former version of section 211.447 in setting forth grounds for termination. Because the juvenile officer's petition was filed after the current version of section 211.447 came into effect, we cite to the current version in this opinion. The amendments to section 211.447 added a subsection irrelevant to the disposition of this case but did not otherwise change the statute.
[5] The affidavit lists items such as methamphetamines, coffee filters, glassware, tubing, anhydrous ammonia, camp fuel, and pseudoephedrine as having been unlawfully possessed and held at Mother's home.
[6] Other requirements of the social service plan agreement will be discussed below.
[7] In the transcript, Randall testified that Mother's brother made the phone call in April 2003, before the children were actually under court jurisdiction. Later, Randall testified that the "court report" where the Division discusses the brother's allegations is dated May 18, 2007. Because neither of the parties submitted the contents of the juvenile court's files to this Court, we are unable to confirm the actual date. We thus assume from Randall's subsequent testimony that the call occurred in April 2007 rather than in April 2003.
[8] In its judgment, the juvenile court refers to the former version of section 211.447 in discussing the reasons for its decision.
[9] We note that the Division does not address Mother's first point in its brief.