

*In the*

*Missouri Court of Appeals*

*Western District*

| | | |
|---|---|---|
| JUVENILE OFFICER, | ) | |
| | ) | |
| Respondent, | ) | WD76303 |
| | ) | |
| W.J., S.C. AND C.M. | ) | OPINION FILED:  March 4, 2014 |
| | ) | |
| Respondents, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.S.M. (MOTHER), | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Cass County, Missouri**
The Honorable J. Michael Rumley, Judge

Before Division One:  Cynthia L. Martin, Presiding Judge, Mark D. Pfeiffer, Judge and
Karen King Mitchell, Judge

A.S.M. ("Mother") appeals from the trial court's entry of judgments finding that,

pursuant to section 211.183.7,[1] the Children's Division is not required to make reasonable

efforts to reunify S.C., W.J., and C.M. with Mother.  Mother argues that the trial court's

finding that Mother subjected S.C., W.J., and C.M. to a severe act or recurrent acts of

---

[1]All statutory references are to RSMo 2000 as supplemented unless otherwise noted.

physical, emotional, or sexual abuse was not supported by substantial evidence and was against the weight of the evidence. We affirm.

## Factual and Procedural History[2]

Mother married C.S.M. ("Stepfather") in 2004. Mother is the biological mother to four children: S.C., a girl who was fourteen years old at the time of the trial court's judgments; N.G., a boy who was twelve years old at the time of the trial court's judgments; W.J., a boy who was seven years old at the time of the trial court's judgments; and C.M., a boy who was two years old at the time of the trial court's judgments. Stepfather is the biological father to W.J. and C.M., while S.C. and N.G. have different biological fathers.

On April 15, 2012, N.G. disclosed to his biological father that he had been sexually molested by Stepfather and that the abuse had been occurring since N.G. was four years old. Upon learning of the abuse, N.G.'s biological father contacted law enforcement officials as well as the Children's Division. The Children's Division arranged for N.G. to have a forensic interview regarding the allegations of sexual abuse. During the forensic interview, N.G. disclosed that he had been sexually abused by Stepfather several times. N.G. wrote on a piece of paper that "[Stepfather] raped me" and that the Stepfather "made me get naked and made me do whatever he wanted." N.G. explained that Stepfather forced N.G. to engage in fellatio with Stepfather and that Stepfather also placed his penis in N.G.'s anus. N.G. also indicated during the forensic

---

[2]We view the facts in the light most favorable to the trial court's decision. *In re N.H.*, 155 S.W.3d 820, 822 (Mo. App. E.D. 2005).

2

interview that he witnessed Stepfather sexually abuse S.C. and W.J. N.G. stated that Mother was present in the home when some of the sexual abuse occurred.

An investigator from the Children's Division visited Mother and Stepfather's residence on April 18, 2012. The investigator informed Mother and Stepfather that the Children's Division was investigating allegations of sexual abuse by Stepfather and that the investigator would need to speak to S.C. and W.J. privately regarding the allegations. S.C. and W.J. both denied being touched inappropriately when they spoke with the investigator and each said that they felt safe in the home.

Mother told the investigator that the family had been investigated previously for hotline reports of child abuse and that each prior report had been found to be unsubstantiated. In particular, the family had a number of prior hotline reports, including allegations that Stepfather touched S.C. inappropriately and that Stepfather helped S.C. bathe and change menstrual pads. Mother was present for each prior investigation and knew the nature of the hotline reports being investigated.

The next month, May 2012, Mother allowed S.C. to travel to Colorado with Stepfather. On the way, Stepfather stopped at a rest stop and raped S.C. in the car. While in Colorado, Stepfather and S.C. stayed with Stepfather's father and stepmother. Despite having the option to sleep on couches, Stepfather and S.C. slept on an air mattress together. Stepfather's stepmother walked in on Stepfather and S.C. while the two were on the air mattress. S.C.'s pants were pulled down at the time, and Stepfather threw a blanket over her. Stepfather and S.C. then went to stay at a hotel, where Stepfather raped S.C.

3

While S.C. and Stepfather were in Colorado, S.C. began feeling ill. Stepfather bought S.C. a home pregnancy test, which revealed that S.C. was pregnant. At the time she took the home pregnancy test, S.C. was thirteen years old and knew that Stepfather was the father of the baby. Stepfather was angry when he found out that S.C. was pregnant and told S.C. to lie about how the child was conceived. When S.C. spoke with Mother on the phone about the pregnancy on May 27, 2012, S.C. told Mother that she was raped by an unknown boy while she was at an aunt and uncle's house in Raymore, Missouri. S.C. testified that she lied because she was afraid Stepfather would hit her, her brothers, or Mother.

Stepfather and S.C. traveled back to the family home in Missouri on May 29, 2012. Mother arranged for S.C. to visit her pediatrician to confirm the pregnancy. On May 30, 2012, S.C. saw Dr. Quyen Dam ("Dr. Dam"), and Mother, Stepfather, and C.M. accompanied her to the appointment. Dr. Dam examined S.C. and confirmed the pregnancy. S.C. told Dr. Dam that the pregnancy was a result of being raped by an unknown boy. Dr. Dam informed the family that she had an obligation to report the rape of S.C. to Children's Division officials and told the family to report the rape to the police. Dr. Dam also gave S.C., Mother, and Stepfather a list of obstetricians and, in response to Stepfather's request, abortion providers. Mother informed Dr. Dam that S.C. would be having an abortion.

Later on May 30, 2012, Dr. Dam telephoned Mother to inform Mother that she had already made a report of the rape to the Children's Division and asked if the family had reported the rape to the police. Mother responded that she had not yet reported the

4

rape because she had not had time. In fact, Mother never contacted the police to report the rape by the unknown boy.

Upon learning of S.C.'s pregnancy, the Children's Division submitted a non-caretaker referral report[3] to the Raymore Police Department and the Cass County Juvenile Office on May 31, 2012. On June 1, 2012, Detective Rachel Jacobson ("Detective Jacobson") of the Raymore Police Department received a report dated May 31, 2012, from the Children's Division regarding the rape of S.C. by an unknown boy. The report indicated that S.C. was pregnant and that the family had previously been investigated by the Children's Division regarding alleged sexual abuse of S.C., N.G., and W.J. by Stepfather.

Detective Jacobson went to Mother and Stepfather's residence during the evening hours of June 1, 2012, to investigate the allegations set forth in the non-caretaker referral report. Mother and Stepfather informed Detective Jacobson that they had been too busy to report the rape of S.C. by an unknown boy to the police. Mother and Stepfather relayed the story of their discovery of S.C.'s pregnancy and of the rape by the unknown boy. Detective Jacobson described Mother and Stepfather's behavior during her visit to their house as "odd" for the situation because Mother and Stepfather "didn't really seem like they cared." Detective Jacobson also talked to S.C., who "relayed the same generic story" about the rape by the unknown boy.

---

[3]A Children's Division investigator explained that the Children's Division makes a non-caretaker referral to appropriate agencies "when the alleged perpetrator did not have care, custody, and control of the juvenile" because the "Children's Division doesn't investigate [those situations]."

5

After speaking with S.C., Detective Jacobson again spoke with Mother and Stepfather to explain that someone would be in contact with them to set up a forensic interview of S.C. Mother informed Detective Jacobson that S.C. had an appointment at Planned Parenthood for an abortion the next week. Detective Jacobson told Mother and Stepfather that she would be coordinating with Planned Parenthood to collect the fetus for genetic testing. Mother and Stepfather appeared "stunned" in reaction to Detective Jacobson's statement. Later, Detective Jacobson learned that S.C.'s appointment for an abortion had been cancelled. Mother explained that she cancelled the appointment because she did not have S.C.'s birth certificate.

S.C., W.J., and C.M. were removed from Mother and Stepfather's custody on June 7, 2012, and the trial court issued orders of protective custody for the three children shortly thereafter.[4] The Cass County Chief Juvenile Officer ("Juvenile Officer") filed first amended petitions with respect to S.C., W.J., and C.M. Each first amended petition alleged that Mother was aware of sexual abuse perpetrated by Stepfather on S.C., N.G., and W.J. and asked the trial court to "enter such judgment as [it] shall find to be necessary."

The trial court held a hearing to consider whether the situation supported a "severe acts finding" pursuant to section 211.183.7. Several witnesses testified during the hearing, including S.C., N.G., N.G's biological father, Dr. Dam, Detective Jacobson, and

---

[4]The record is unclear as to whether N.G. was also removed from the home on June 7, 2012. Nonetheless, the record does indicate that, at the time of the hearing, N.G. was living with his father in Columbia, Missouri. There is nothing in the record regarding the adjudication of Mother's rights with respect to N.G.

Mother. At the time of the hearing, Mother was still married to Stepfather and had indicated that "she was working on her marriage."

At the time of the hearing, S.C. was fourteen years old and had given birth to a baby girl. DNA testing established that the baby girl's biological father was Stepfather. S.C. testified that Stepfather began touching her sexually when she was in kindergarten. In particular, Stepfather touched S.C.'s breasts and vagina with his hands and placed his penis in her mouth. S.C. also recalled that Stepfather had raped her several times. S.C. testified that Mother witnessed Stepfather pinch S.C.'s breasts on at least one occasion, and Mother told S.C. not to tell anyone that Stepfather touched her in that way. Further, S.C. testified that most of the sexual abuse by Stepfather happened in the home and that Mother was present in the home when the abuse occurred. S.C. also testified that Mother asked her several times if "anything (sexual) was going on."

N.G. testified during the hearing that he told the truth during the forensic interview in April 2012. A video recording of the forensic interview, during which N.G. stated that he witnessed Stepfather sexually abuse S.C. and W.J., was entered into evidence and played during the hearing. In addition, a copy of the drawings and notes that N.G. made during the forensic interview were entered into evidence.

Following the hearing, the trial court issued findings of fact and conclusions of law with respect to S.C., W.J., and C.M. The trial court concluded that Mother subjected S.C., W.J., and C.M. to a severe act or recurrent act of sexual abuse so that, pursuant to section 211.183.7, the "Children's Division shall not be required to make reasonable efforts toward reunification with [Mother]." The trial court then entered orders and

7

judgments with respect to S.C., W.J., and C.M. in which the trial court concluded that it was in the best interest of the children for the court to retain legal jurisdiction and for the children to remain in foster care.[5]  The orders and judgments also concluded that the Children's Division "is not required to make reasonable efforts to reunify [the children] with [Mother]."

Pursuant to section 211.183.8, the trial court held a permanency hearing within thirty days of its issuance of the orders and judgments.  The trial court ordered that, with respect to S.C., "the Children's Division shall, within thirty (30) days, provide the Juvenile Office a referral for termination of parental rights regarding the mother."  With respect to W.J. and C.M., Stepfather's two biological children, the trial court entered a nearly identical order but specified termination of parental rights with respect to both Mother and Stepfather.

Mother appeals.

**Authority to Consider Appeal**

"Before we consider the merits of [Mother's] appeal, we must *sua sponte* determine whether we have authority to do so."  *In re G.G.B.*, 394 S.W.3d 457, 461-62 (Mo. App. E.D. 2013).  Section 211.261.1 provides that a parent may appeal "from any final judgment, order or decree made under the provisions of this chapter which adversely affects him."  What constitutes a "final judgment, order or decree" in a juvenile matter differs from what constitutes a final judgment in other civil cases because the juvenile

---

[5]Separate orders were entered as to each child although they are virtually identical.  We refer to the trial court's orders and judgments collectively in this Opinion for ease of reference.

8

court exercises continuing jurisdiction over a child. *In re C.A.D.*, 995 S.W.2d 21, 26 (Mo. App. W.D. 1999). "The juvenile court's exercise of continuing jurisdiction over a child . . . does not defeat a right to appeal." *Id.* at 27. Once the trial court issues a judgment that includes the disposition or treatment of the juvenile, "all the issues before the . . . court have been disposed and nothing has been left for future determination, and the judgment is final and appealable." *Id.*

Here, Mother appeals from the trial court's orders and judgments with respect to S.C., W.J., and C.M. in which the trial court concluded that, pursuant to section 211.183.7, the Children's Division need not make reasonable efforts to reunify the children with Mother. In addition, the orders and judgments include the trial court's conclusion that S.C., W.J., and C.M. remain in the legal custody of the Children's Division and be placed in foster care. Under *In re C.A.D.*, the orders and judgments are final judgments that adversely affect Mother, giving us the authority to consider her appeal. *Id.*; *see also In re N.B.*, 64 S.W.3d 907, 913 (Mo. App. S.D. 2002) (concluding that the appellate court had authority to consider a parent's appeal from a judgment that, *inter alia*, released the Children's Division from making further reasonable efforts to reunify the mother with her child pursuant to section 211.183.7).

## Standard of Review

We review juvenile proceedings under the same standard used for court-tried civil cases. *In re G.F.M.*, 169 S.W.3d 109, 111 (Mo. App. W.D. 2005). "The trial court's order is sustained unless no substantial evidence supports it, it is against the weight of the

evidence, or it erroneously declares or applies the law." *Id.* We defer to the trial court on issues of fact and witness credibility. *Id.*

Mother argues that the weight of the evidence supporting a "severe act" finding must be clear, cogent, and convincing. She cites no authority for this proposition, and we have found none. Though grounds for terminating parental rights must be established by clear, cogent, and convincing evidence, that is because section 211.447.6 so requires. By its terms, section 211.447.6 applies only to termination of parental rights proceedings. We reject, therefore, Mother's contention that clear, cogent, and convincing evidence of a "severe act" is required to support a finding under section 211.183.7(1).

## Analysis

Mother raises a single point on appeal. She argues that the trial court's finding that the Children's Division need not provide reasonable efforts to reunify S.C., W.J., and C.M. with Mother pursuant to section 211.183.7(1)[6] because Mother subjected the children to a severe act or recurrent acts of sexual abuse was not supported by substantial evidence. Specifically, Mother contends that "the evidence presented failed to show how such evidence constituted a severe act or recurrent acts of physical, emotional or sexual abuse" by Mother.

Section 211.183.1 concerns the services the Children's Division must provide prior to and following the removal of a child from a parent's care. Section 211.183.1 requires the Children's Division to make reasonable efforts: (1) "to prevent or eliminate the need

---

[6]Mother's point relied on actually refers to "section 211.187.7(1)." We afford Mother the benefit of the doubt that is was her intent to refer to section 211.183.7(1).

10

for removal of the child" from the home; and (2) "after removal, to make it possible for the child to return home."  "Reasonable efforts" are statutorily defined as "the exercise of reasonable diligence and care by the [Children's Division] to utilize all available services related to meeting the needs of the juvenile and the family."  Section 211.183.2.  In determining what reasonable efforts are appropriate, "the child's present and ongoing health and safety shall be the paramount consideration."  *Id.*

While section 211.183 generally requires the Children's Division to make reasonable efforts, the statute outlines two categories of exceptions.  The first category relates *only* to those reasonable efforts the Children's Division must make *before* removing a child from the home.  Section 211.183.1 relieves the Children's Division of the reasonable efforts requirement "[i]f the first contact with the family occurred during an emergency in which the child could not safely remain at home even with reasonable in-home services."  The trial court found in its orders and judgments that:

> [R]easonable efforts to prevent or eliminate the need for removal of [S.C., W.J., and C.M.] from the home were not possible due to the emergency nature of the situation as set forth in the Children's Division Exhibit No. 2 submitted to the Court at the June 12, 2012, hearing and incorporated herein by reference, and, therefore, the Children's Division is deemed to have made reasonable efforts.

Mother has not claimed error in this finding.  Thus, this exception is not relevant to the issue raised by Mother on appeal.

The second category of exceptions applies to the Children's Division's reasonable efforts obligations *after* removal of a child from the home.  Section 211.183.7 provides:

11

The division shall not be required to make reasonable efforts, as defined in this section, but has the discretion to make reasonable efforts if a court of competent jurisdiction has determined that:[7]

(1) The parent has subjected the child to a severe act or recurrent acts of physical, emotional or sexual abuse toward the child, including an act of incest; or

(2) The parent has:

    (a) Committed murder of another child of the parent;

    (b) Committed voluntary manslaughter of another child of the parent;

    (c) Aided or abetted, attempted, conspired or solicited to commit such a murder or voluntary manslaughter; or

    (d) Committed a felony assault that resulted in serious bodily injury to the child or to another child of the parent; or

(3) The parent's parental rights to a sibling have been involuntarily terminated.

The trial court concluded that Mother subjected her children to a severe act or recurrent acts of sexual abuse perpetrated by Stepfather,[8] the exception set forth in subdivision (1). It is this finding that Mother contests.

The trial court's orders and judgments contain detailed findings of fact. The trial court's findings indicate that the trial court believed that Mother knew or should have

---

[7]Because this subsection requires a court of competent jurisdiction to determine that the Division is relieved of its obligation to exercise reasonable efforts to reunify, it follows that the subsection is implicated only after a child has been removed from the home and applies to relieve the Division prospectively (as opposed to retrospectively) of the obligation to exercise reasonable efforts.

[8]Although not the focus of her appeal, Mother mentions in her Brief that she was not the perpetrator of the sexual abuse. The plain language of section 211.183.7(1) reveals that the parent need not be the perpetrator of the severe act or recurrent acts of abuse. The phrase "the parent has subjected" indicates that the Legislature intended for the Children's Division to be exempt from reunification efforts even if someone other than the parent committed the severe act or recurrent acts of abuse. If the Legislature intended the exception to apply only in situations in which the parent was the perpetrator, then it would have written the statute, as it did in subdivision (2), to clarify that the parent must "*commit*" a severe act or recurrent acts of abuse toward the child. Our view is consistent with the Eastern District's decision in *In re A.H.*, 45 S.W.3d 899 (Mo. App. E.D. 2001) (concluding there was substantial evidence that a mother subjected her child to a severe act of physical abuse when the evidence demonstrated that her boyfriend dropped a toddler approximately four feet onto concrete).

known that Stepfather was sexually abusing one or more of her children. The trial court held that the intent of section 211.183.7(1) "is that if a parent *knew or should have known that she was exposing her child to a situation in which severe or recurrent acts of abuse were likely to occur*, the Division should be relieved of providing reasonable efforts toward reunification with said parent." (Emphasis added.)

Mother does not take issue with the trial court's conclusion that section 211.183.7 permits a severe act finding where the evidence establishes either that a child has been abused or that a child is in a situation where abuse is likely to occur.[9] In fact, Mother concedes in her Brief that "the behavior of [Stepfather] . . . was so extreme in nature that a severe act [finding] under the statute was warranted" as to all of Mother's children. [Appellant's Brief, p. 11]. Mother holds this view even though, as Mother notes in her Brief, there was no evidence presented to the trial court that Stepfather abused C.M.

Mother's only quarrel on appeal is that the same fate appropriate for Stepfather "should not befall" her. [Appellant's Brief, p. 11]. Mother claims that to find a severe act, the evidence must establish that she purposefully subjected her children to Stepfather's "extreme harm." [Appellant's Brief, pp. 11-12]. Mother complains that the Juvenile Officer could not point to a single piece of evidence to prove a severe act finding and instead resorted to "cobbl[ing] together several 'incidents' of Mother's behavior over

---

[9]The trial court found that "[t]he evidence clearly demonstrated that [Stepfather] sexually abused [S.C., N.G., and W.J.]" The trial court then found that Mother subjected S.C., W.J., and C.M. "to a severe act by allowing [Stepfather] to sexually abuse [S.C., N.G., and W.J.]" There was no evidence that C.M. (who was only two years old at the time of the trial court's orders and judgments) had been abused by Stepfather. Because Mother has not raised or preserved the issue, we express no opinion as to whether the possibility that a child will be abused because another child in the home has been abused satisfies the standard that a "parent has subjected *the child* to a severe act or recurrent acts of . . . abuse." Section 211.183.7(1) (emphasis added); *cf.* section 211.447.5(2)(c) (permitting the filing of a termination of parental rights action if "[a] severe act or recurrent acts of . . . abuse toward *the child or any child in the family* by the parent" is demonstrated to have occurred (emphasis added)).

13

the course of months and years to create the illusion of a parent knowledgeable about abuse but indifferent to the harm perpetrated on her children by [Stepfather]." [Appellant's Brief, p. 12].

Mother's argument is fundamentally flawed. She offers no support for the premise that the Juvenile Officer was required to point to a single act or event to establish the "severe act" exception. Rather, the trial court was free to consider the totality of the evidence to determine whether it believed Mother knew or had reason to know that Stepfather was abusing one or more of her children. The weight of the evidence supports this conclusion.

For example, S.C. testified that Mother witnessed Stepfather fondle S.C.'s breasts. S.C. testified that, for several years, Stepfather would "pinch [her] boob" in front of other people, including Mother, who once told S.C. "not to tell anybody" that Stepfather touched her breasts. S.C. testified that her Mother was home on several occasions when Stepfather sexually abused her.

Mother argues on appeal that the trial court erred in relying on S.C.'s testimony because Mother testified that she witnessed Stepfather accidentally touch S.C.'s breast once while the two were engaging in horseplay but that she never told S.C. to keep the incident a secret. Mother also testified that she never witnessed any sexual abuse of S.C. by Stepfather, notwithstanding S.C.'s testimony that Mother was home some of the times that the abuse occurred. Mother's argument ignores that the trial court has the obligation to make credibility determinations and that we are bound by those determinations. *In re G.F.M.*, 169 S.W.3d at 111. When faced with competing testimony between S.C. and

14

Mother concerning Stepfather's touching of S.C.'s breasts, the trial court chose to give credence to S.C.'s testimony. Mother's observation of Stepfather pinching S.C.'s breasts, when considered in conjunction with Mother's failure to report the rape of her daughter to the police, is further evidence of Mother's knowledge of Stepfather's sexual abuse of S.C. The trial court was also free to disbelieve Mother's claim that she was unaware of the abuse being perpetrated on S.C. by Stepfather while she was in the home. "[T]he trier of fact has the right to disbelieve evidence, even when it is not contradicted." *White v. Dir. of Revenue*, 321 S.W.3d 298, 307 (Mo. banc 2010) (internal quotation marks omitted).

In addition, Mother's conduct after learning of S.C.'s pregnancy supports the inference that Mother had reason to suspect that her daughter had been abused by Stepfather. Despite learning that her thirteen-year-old daughter was pregnant and despite her daughter's report that she had been raped by an unknown boy while she was at a relative's house, Mother never contacted the police. Mother explained at the hearing that she did not immediately report the rape to the police because, "I was waiting for [Stepfather and S.C.] to come home because I figured [the police] would want to talk to her. They would want to see her." The trial court was free to disbelieve this explanation for Mother's failure to take any action upon learning that her daughter had been raped and to instead conclude that Mother failed to report the rape to protect Stepfather. *See id.*

The trial court's rejection of Mother's explanation is further supported by the fact that Mother did not to file a police report even after S.C. and Stepfather returned home from Colorado on May 29, 2012. Instead, Mother made an appointment for S.C. with Dr. Dam to confirm the pregnancy "because pregnancy tests aren't always correct." Dr. Dam

examined S.C. on May 30, 2012, and concluded that S.C. was pregnant. On the same day, Dr. Dam directed Mother to report the rape to the police. Yet Mother persisted in her failure to file a police report, explaining at the hearing that she simply did not have the time to do so. Mother did, however, have the time to schedule an appointment for S.C. to have an abortion, an appointment Mother promptly cancelled after Detective Jacobson informed her that the police would collect the fetus for genetic testing to determine the biological father.

Finally, even after being informed that Stepfather was the biological father of S.C.'s child, Mother indicated to the children's guardian ad litem that she was "working on her marriage" with Stepfather. At the time of the hearing, Mother was still married to Stepfather and, although Stepfather was incarcerated in a county jail awaiting trial, living in the same residence she shared with Stepfather and his family.

Based on the foregoing evidence, the trial court could reasonably have concluded, and in fact did conclude, that Mother's actions were consistent with having knowledge of, or reason to know of, Stepfather's sexual abuse of S.C.

Mother challenges the trial court's reliance on prior unsubstantiated investigations of the family by the Children's Division as evidence tending to suggest that Mother knew or had reason to know of the sexual abuse perpetrated by Stepfather. Mother argues:

> [I]f this Court adopts a precedent of holding all parents who have been the subjects of any [Children's] Division investigation for physical, emotional or sexual abuse, even if found to be baseless and unsubstantiated, guilty of committing a severe act of harm or recurrent acts of harm on their children, hundreds of Missouri parents will be risk for trial courts across the state to easily make a "severe act" finding and be fast-tracked to termination of parental rights proceedings.

16

[Appellant's Brief, p. 23].  The trial court's findings of fact and conclusions of law with respect to S.C., W.J., and C.M. suggest that the trial court considered the prior unsubstantiated investigations of the family.  The trial court concluded:

> There was evidence presented that, on several occasions, the [Children's] Division interacted with [Mother] as a result of multiple hotline calls reporting abuse by [Stepfather] or [Mother].
>
> . . . .
>
> [Mother] repeatedly ignored . . . reports that [Stepfather] assisted [S.C.] with her personal hygiene, and reports that someone had witnessed [Stepfather] sexually assaulting three of her children.  Despite all of this, [Mother] allowed [Stepfather] unfettered access to her children, including [S.C.], whom he eventually impregnated.

We share Mother's concern that a trial court should not rely on unsubstantiated investigations of a family as probative evidence of knowledge that abuse is occurring.  *See In re W.C.*, 288 S.W.3d 787, 796 (Mo. App. E.D. 2009) (concluding that prior unsubstantiated investigations of the family by the Children's Division did not constitute "clear, cogent, and convincing evidence to support a finding of severe or recurrent acts of abuse" under section 211.447.5(2)(c), the termination of parental rights statute).  However, we do not read the trial court's reference to the prior hotline investigations of this family as supporting a conclusion that Mother knew Stepfather was abusing one or more of her children.  Rather, read in context, the findings support the trial court's conclusion that a variety of circumstances and events cumulated to cause Mother to have reason to know that Stepfather might be engaging in inappropriate behavior with one or more of her children.  That reason to be suspicious would be consistent with Mother's frequent inquiries of S.C. about "whether anything [sexual] was going on."  And that

17

reason to be suspicious would be consistent with Mother's unusual response to the news that S.C. had been impregnated by rape.

Nonetheless, even were we to conclude (which we do not) that the trial court erred in relying for any purpose on the unsubstantiated hotline reports, that error would be harmless as the remaining evidence herein addressed was sufficient to support the trial court's conclusion that Mother knew or had reason to know that Stepfather was sexually abusing one or more of her children.

The trial court did not err in finding that Mother subjected her child to a severe act or recurrent acts of sexual abuse by Stepfather.

Mother's point on appeal is denied.

## Conclusion

We affirm.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

18